Commonwealth *v.* Johnson, Appellant.

Argued May 6, 1970. Before Bell, C. J., Jones, Cohen, Eagen, O'Brien, Roberts and Pomeroy, JJ.

*John M. Tighe,* for appellant.

*Carol Mary Los,* Assistant District Attorney, with her *Robert W. Duggan,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE O'BRIEN, October 9, 1970:

Appellant, William Johnson, was tried September 11-18, 1968, by a judge and jury on charges of assault and battery, burglary and resisting arrest. He was convicted of assault and battery and resisting arrest, but the jury was discharged as to the burglary charge, as it was unable to reach a verdict on that point. Appellant was sentenced to one and one-half to three years, and the Superior Court, in a per curiam opinion, affirmed the judgment of sentence. We granted allocatur and now we reverse.

Appellant raises four arguments in his appeal. Two of these arguments relate to alleged improprieties by the court in the way it handled the problems created by numerous sensational and inflammatory items relat-

ing to another incident involving appellant, which filled the local news media shortly before appellant's scheduled trial in the instant case.

The crimes for which appellant was being tried were committed in October, 1967. On August 22, 1968, Johnson was accused of having attacked Assistant Superintendent Kelly of the Pittsburgh Police Department during a meeting between black citizens from Pittsburgh's Homewood section and city officials at the City Council Chambers in Pittsburgh. During the next two weeks the newspapers and the radio and television stations in Pittsburgh produced a steady flow of news items mentioning the appellant, some of them highly inflammatory and prejudicial. In his applications for a continuance (first on August 29 and later on September 11), appellant's counsel presented the following news items, allegedly prejudicial to the appellant, as reasons why his trial should be delayed:

(1) A copy of the Pittsburgh Press, hereinafter referred to as the Press, of August 22, 1968. The headline on Page 1 stated: "BLACK MOB BEATS TOP COP KELLY" and a substantial article described the aforementioned incident in the City-County Building and identified the appellant as Kelly's assailant.

(2) A copy of the Pittsburgh Post-Gazette, hereinafter referred to as P.G., for August 23, 1968. On Page 1, the headline stated: "BLACKS BEAT ASSISTANT SUPERINTENDANT KELLY." Appellant was identified on the Page 1 article as Kelly's assailant and his and Kelly's photos were reproduced on Page 1 side by side. Also on Page 7 of the same issue, the appellant's previous arrest record was published right next to the continuation of the previously-mentioned Page 1 article.

(3) A Press article of August 23, 1968, featuring a Page 1 editorial on the Kelly incident depicting the assailants as a "vicious mob," "hoodlums," and color-

fully drawing an analogy between them and famous criminals such as John Dillinger and Al Capone. Right underneath the editorial article was a photograph of the appellant with his name. Also on Page 1 was an article again discussing the Kelly incident and the reaction to appellant and his deeds by the Mayor of Pittsburgh. Also on Page 1 of the same issue and continued on Page 4 right beneath the appellant's photo was a lengthy article giving appellant's prior police arrest record. The continuation of both Page 1 articles onto Page 4 conveniently led the reader into another article wherein the Mayor of Pittsburgh condemned Mr. Johnson's release after "a dastardly act." Also in another separate article appeared commentary of District Attorney Robert Duggan referring to the appellant by name and also interspersing these references with repeated references to "criminals and hoodlums."

(4) A Press article of August 24, 1968, headlined: "Kelly Assailant Held In New Attack." This headline appeared on Page 1. Also on Page 1 an article alluded to the district attorney's characterization of the appellant as a hoodlum and recited the alleged new misconduct of appellant in an automobile incident. The article continued on Page 3 and disclosed more of Mr. Duggan's inflammatory commentary about the appellant.

(5) An article on Page 1 of the P.G. of August 24, 1968. Again, Mr. Duggan's characterization of the appellant as a hoodlum and criminal was published. Also, an article in the same paper related that appellant was arrested for a new charge and pointed out that he was charged with assaulting a police officer nine days previous to the publication of the article. (This latter charge was a third charge and in no way related to the Kelly incident or the automobile incident.) The newspaper article, of course, indicated that

there was a charge against appellant for assault and battery arising out of the Kelly incident.

(6) An article in the Press, August 25, 1968, featuring appellant's photo, and Mr. Duggan's criticism of a magistrate for allowing the appellant low bail after his arrest in the Kelly incident. Appellant was portrayed as a man with a long history of violations. His previous record was again divulged.

(7) An article in the P.G. of August 26, 1968, featuring Mr. Craig, Safety Director of the City of Pittsburgh, and his criticism of District Attorney Duggan for failure to try appellant for burglary and other offenses which had been pending for at least eight months. Appellant's more recent alleged misconduct was set forth in the same article.

(8) A Page 1 article in the Press of August 25, 1968, in which District Attorney Duggan intoned that hoodlums shall be removed from the streets. Specifically mentioned along with two others was appellant, who, in the district attorney's words, had a long criminal record. Further in the article the district attorney was quoted as referring to the appellant as a spokesman for arsonists, hoodlums, and insurgents, and a false leader "who would go to any extreme to avoid living under the laws of our Commonwealth."

(9) A Press article of August 26, 1968, revealing that the instant case was to be tried September 10, 1968. Listed for public consumption were the following charges: (a) Burglary, fraudulent use of credit card; (b) Burglary, aggravated assault and battery on a police officer, resisting arrest; (c) Burglary, assault and battery and resisting arrest; (d) The Kelly incident charges and alleged attempt to run down a police officer (automobile incident) were mentioned as pending indictments; (e) Also mentioned were charges of burglary, larceny, receiving stolen goods and fraudulent use of a credit card. Further emphasis was given

to the district attorney's criticism of "the hoodlum element."

(10)  A P.G. editorial of August 27, 1968, in which appellant was named and it was suggested that "in the case of a defendant who repeatedly assaults police officers, a psychiatric examination might well be in order.  Perhaps he belongs in an institution other than a prison."

(11)  An article on the first page of the second section of the P.G. of August 30, 1968.  Again the appellant was mentioned in connection with an assault on officer Kelly.

(12)  A Press article of August 29, 1968, referring to appellant's involvement in the Kelly incident and referring to a separate assault on some others with a shotgun by the defendant.

(13)  A P.G. article of September 4, 1968, in which Mayor Barr of the City of Pittsburgh commented as to his extreme displeasure with the alleged attack on Kelly in the City-County Building.

(14)  A Press article of August 30, 1968.  On Page 1 the article divulged that District Attorney Duggan asserted that appellant was a hoodlum.  Also in the article it was pointed out that a local churchman, Msgr. Charles O. Rice, was critical of the district attorney's handling of the problem.  The article pointed out that the churchman himself was critical of appellant's alleged conduct in the Kelly incident.  Also, the churchman stated that appellant also had a credit card charge against him.

(15)  A Press article of September 4, 1968, with the following headline on Page 1: "DOMESTIC WAR ON GRAND JURY TOLD."  Also on Page 1 an article related how a local judge made an address to the Grand Jury about the criminal activity of civil rights militants and a need for punishing them.

(16)   A P.G. article of September 5, 1968, carrying the same story mentioned in Item 15 above.

(17)   A. P.G. editorial of September 6, 1968, criticizing the aforementioned judge for his remarks to the Grand Jury as explained in the preceding two paragraphs. The paper disputed the judge's linking of civil rights and the criminal element.

(18)   An article in the Pittsburgh Catholic of August 30, 1968, discussing the appellant's alleged conduct in the Kelly incident and condemning it. Also, it revealed that there was a charge of fraudulent use of credit card pending against the appellant.

(19)   A group of transcripts of various radio broadcasts on radio station WWSW in Pittsburgh, Allegheny County, on August 22, 24, 25 and 26. All of the events covered in the newspapers including the reviewing of appellant's arrest record and the inflammatory commentary of public officials was given.

(20)   A group of transcripts of television broadcasts on television station KDKA on August 22, 6 o'clock p.m. and 11 o'clock p.m., August 23, 12 o'clock noon, 7 o'clock p.m., and 11 o'clock p.m., August 27, 6 o'clock p.m. These broadcasts revealed appellant's arrest record, displayed his photograph and conveyed inflammatory commentary of various public officials including but not limited to District Attorney Duggan.

(21)   A transcript of WTAE television news broadcast at 11 o'clock p.m., on September 11, 1968, alluding to appellant's participation in the Kelly incident by way of announcing to the public that the instant case would be tried.

(22)   A transcript of a KDKA television broadcast of September 11, 1968, at 7 o'clock p.m., alluding to appellant's participation in the Kelly incident.

(23)   In addition to the foregoing television broadcasts, one witness (Msgr. Charles O. Rice) testified

that Pittsburgh television Channels 4 and 11 carried broadcasts wherein District Attorney Duggan made reference to appellant as part of the hoodlum element. This was on August 24 or August 25, 1968.

The record also discloses that the trial date for the charges in the instant case had originally been scheduled for November, 1968. Then the newspapers publicized a charge by Safety Director Craig that District Attorney Duggan had been lax in allowing the instant case to be delayed as long as it had been. Shortly thereafter, on August 26, 1968, although counsel for appellant had been assured by the district attorney's office before going on vacation in August, 1968, that the indictments would not be tried until after November, 1968, a trial date of September 10, 1968, was announced in the newspapers.

On August 29, 1968, in a hearing asked for by appellant to request a postponement, the court denied appellant's request.

On September 11, 1968, appellant reapplied for a continuance. Again, the appellant's application for a continuance was denied. Then selection of a jury commenced pursuant to requests that voir dire be had under Pennsylvania Rule of Criminal Procedure 1106(b), which reads as follows: "(b) The voir dire of prospective jurors shall be conducted individually and may be conducted beyond the hearing and presence of other jurors."

Although interrogation proceeded on an individual basis, interrogation of each juror was in the presence of all other prospective jurors. Consequently, each juror was asked whether he had heard anything or read anything about the appellant, and whether as a result of such information he was prejudiced against the appellant in the particular case at bar. But no juror was asked specifically what he had read or heard because

this would have risked divulging the harmful matters to other jurors who were, up until that time, hopefully untainted by the prejudicial and inflammatory pretrial publicity.

Appellant argues that the trial court erred in refusing a continuance when there was a reasonable likelihood at the time of trial that appellant could not receive a fair trial as a result of the extensive and inflammatory pretrial publicity about him and that the trial court erred in refusing interrogation of prospective jurors out of the hearing of other prospective jurors.

The United States Supreme Court spoke emphatically and at length on the question of protecting the defendant's right to a fair trial in the face of prejudicial publicity, either during or before the trial, in its opinions in the cases of *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507 (1966), and *Estes v. Texas*, 381 U.S. 532 (1965). The situation in the instant case is admittedly different in degree from the situations present in those cases. First, pretrial publicity concerned another incident in which the appellant was involved rather than the incident which was the subject of the trial. Second, the publicity was nowhere near as extensive as the publicity which occurred before the *Sheppard* and *Estes* trials. Third, insofar as the publicity consisted of accurate accounts of appellant's attack on Kelly, it will not support a finding of prejudice. People who punch the Assistant Superintendent of Police at a public meeting have to expect a little publicity, even when they are acting under the belief, as appellant claimed, that the Assistant Superintendent was about to draw a gun.

However, the pretrial publicity afforded appellant consisted of much more than the accounts of his encounter with the Assistant Superintendent. First, it

included detailed accounts of appellant's prior record, which would, of course, not have been legally admissible at his trial. Second, and particularly prejudicial, because they were so deliberately inflammatory, were remarks by the district attorney, such as his statement that appellant and two other black spokesmen were "false leaders" who "speak for the arsonists, hoodlums and insurgents who would go to any extreme to avoid living under the laws of the Commonwealth." Inflammatory statements like this were hardly calculated to create an atmosphere for trial which would provide the "judicial serenity and calm to which petitioner was entitled." *Estes v. Texas, supra.*

As we said in *Commonwealth v. Cicere,* 282 Pa. 492, 495, 128 Atl. 446 (1925): ". . . [T]he district attorney is a quasi-judicial officer, representing the Commonwealth, which seeks no victims, but only justice . . . since he is invested with these grave responsibilities, he should, at all times, conduct the Commonwealth's case fairly, present it in an impartial manner and avoid seeking to influence the jury by arousing their prejudices. . . ."

The Commonwealth argues that even if the pretrial publicity was inflammatory, the lower court did not err in refusing the appellant's motion for a continuance where the record reveals no clear evidence that the prospective jurors were familiar with the particularly inflammatory publicity and, therefore, no clear evidence that their prejudices had, in fact, been aroused.

Under the circumstances, it was incumbent upon the court to take steps to insure that the trial would not be prejudiced. One such step, as outlined in Rule 1106(b) of the Rules of Criminal Procedure was to permit the appellant to conduct voir dire of each juror on an individual basis outside the hearing of the other prospective jurors.

During interrogation all of the jurors who indicated they had read or heard of the appellant indicated that despite such awareness of him, they were of an open mind.[1] Had Rule 1106(b) been invoked by the court, each individual juror could have been questioned out of the hearing of other jurors. Then he could have been examined as to the exact amount of publicity concerning the appellant he had experienced, and which information he had retained, and in this manner possible challenges for cause might have developed.

The Commonwealth argues that the right which the appellant seeks under Rule 1106(b) is clearly discretionary with the trial judge. It emphasizes the use of the word "may" rather than "shall" in the second part of the rule: "The voir dire of prospective jurors *shall* be conducted individually and *may* be conducted beyond the hearing and presence of other jurors." (Emphasis supplied.)

While the use of the word "may" indicates that voir dire of each juror in isolation is discretionary, it is difficult to imagine circumstances where the need for such isolation could be more urgent.

If the action of the trial court in arbitrarily refusing to allow voir dire out of the hearing of other jurors were upheld, it would have the effect of writing into the rule a provision that a trial judge need not take an easy precaution which might prevent a trial from being prejudiced by pretrial publicity if he doesn't want to. When there is present in a case inflammatory pretrial publicity which creates the possibility that a trial could

---

[1] According to appellant's brief, during voir dire three jurors who were actually impaneled and who deliberated on this case had admitted that they were exposed to some pretrial publicity concerning the defendant. Just how much publicity and the nature of the publicity could, of course, not be ascertained in the presence of the other jurors.

be prejudiced, there are exactly those circumstances present which require each juror to be questioned out of the hearing of the other jurors. Consequently, in such situations, when this form of voir dire is requested, it is an abuse of discretion to refuse that request.

Although it is not necessary in reaching the result we reach today, we will briefly discuss one other issue raised by the appellant.

We held in *Commonwealth v. Collemacine*, 429 Pa. 24, 239 A. 2d 296 (1968), that a defendant is entitled to notice of presentment of his case to the grand jury if the presentment is to a grand jury other than the next term after the defendant's preliminary hearing. The purpose of this rule is to enable the defendant to avail himself of his right to challenge the array of grand jurors. Here, appellant claimed that he received no notice, even though his case was presented to a grand jury some three or four grand juries removed from the one which would have heard the matter had it been presented promptly. The only evidence which the Commonwealth presented to show that the appellant had been notified was a red checkmark on the indictment paper itself, which it was said established that appellant had been notified by regular mail. While we will not quash the indictment in the face of this conflicting evidence, some better method of establishing notification must be found. A red checkmark is not sufficient to establish notice in any other area of law, and the district attorney must establish some other procedure to lend an air of certainty to the giving of notice. Otherwise, it will be very difficult for a reviewing court to be sure that a defendant has been granted his constitutional right to challenge the array of the grand jury. *Commonwealth v. Dessus*, 423 Pa. 177, 224 A. 2d 188 (1966). Rule 203 Rules of Criminal Procedure.

The order of the Superior Court is reversed. The judgment of sentence is reversed and a new trial granted.

Mr. Justice JONES, Mr. Justice ROBERTS and Mr. Justice POMEROY concur in the result.