[Civ. No. 13266. Third Dist. Apr. 13, 1972.]

JUAN VALLEJO CORONA, Petitioner, v.
THE SUPERIOR COURT OF SUTTER COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

---

## Counsel

Richard E. Hawk for Petitioner.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Arnold O. Overoye, Jack R. Winkler and Charles P. Just, Deputy Attorneys General, and G. Dave Teja, District Attorney, for Real Party in Interest.

---

## Opinion

**FRIEDMAN, Acting P. J.**—An indictment filed in the Superior Court of Sutter County charges Juan Vallejo Corona with 25 murders. He pleaded not guilty and sought a change of venue, contending that pretrial publicity had prejudiced his right to a fair trial in Sutter County. The trial court denied the motion. He seeks a writ of mandate directing that court to order a change of venue to another county.

We turn initially to the standard governing our decision: When

printed and broadcast pretrial publicity creates a reasonable likelihood that a fair trial cannot be had, the trial court should continue the case until the threat abates or transfer it to another county. (Pen. Code, § 1033, as added by Stats. 1971, ch. 1476; *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383-384 [66 Cal.Rptr. 724, 438 P.2d 372].) "A showing of actual prejudice shall not be required."[1] ■ Following the trial court's refusal of a request for venue change, an appellate court may entertain the request by way of a mandate proceeding. In that proceeding the appellate court may not limit itself to an "abuse of discretion" review; rather, it makes an independent review of the evidence and reaches a de novo decision. (*Maine* v. *Superior Court, supra,* 68 Cal.2d at pp. 379-382.) ■ When the issue is raised before trial, doubts should be resolved in favor of venue change. (*Fain* v. *Superior Court* (1970) 2 Cal.3d 46, 54 [84 Cal.Rptr. 135, 465 P.2d 23].)

The sequence of events commenced on May 19, 1971, when the Sutter County sheriff's office was notified of a shallow indentation in the soil of the Kagehiro ranch near Yuba City. Excavation at the site the next day revealed a grave containing a hacked and lacerated body. The body was that of a 40-year-old migratory farm worker. On Tuesday, May 25, deputies were called to inspect a depression in the soil of the Sullivan orchard, near the edge of the Feather River and about four miles north of Yuba City. Excavation revealed eight bodies. All the bodies bore marks of hacking and stabbing.

Early the following morning petitioner Juan Corona was arrested and charged with the slayings. Corona is a resident Mexican national who made his livelihood as a farm labor contractor. He lived with his wife and four children in Yuba City. That afternoon Corona was taken before a judge of the justice court. The public defender was appointed to represent him. The judge issued an order directing law enforcement personnel, court attaches and attorneys not to provide information other than that shown in public records and not to discuss evidentiary matters.

During that day and the next three days, additional digging revealed fourteen more bodies, most of them buried in the Sullivan ranch. The following week 2 more bodies were uncovered, bringing the total to 25. All the murdered men had been transient agricultural laborers. With one possible exception, all were Caucasian. All the bodies had been hacked and stabbed.

---

[1] *Maine* v. *Superior Court, supra,* 68 Cal.2d at page 383, quoting a report submitted to the American Bar Association, commonly known as the Reardon Report and currently cited as Standards Relating to Fair Trial and Free Press, Approved Draft, 1968.

Sutter County's population is about 42,000. About a third of the population live in Yuba City, the county seat. Immediately across the Feather River from Yuba City is the City of Marysville, county seat of Yuba County. Yuba City and Marysville comprise a closely connected community. Three daily newspapers, the Marysville-Appeal-Democrat, the Sacramento Bee and the Sacramento Union have substantial readership in Sutter County. A weekly newspaper, the Yuba City Independent-Herald, is published and circulated in the area. Three Sacramento television stations and one Chico television station broadcast to approximately 12,500 homes in Sutter County. The record does not describe the radio news coverage.

Upon discovery of the eight bodies on May 25 a large corps of press and television reporters and cameramen converged upon Sutter County. Writers and photographers of the national wire services and major California newspapers, as well as local news reporters, were on the scene. Television coverage (the films of which are in evidence) was extensive and detailed. News photographs and television film portray the sheriff, the district attorney and defense counsel surrounded by swarms of newsmen and arsenals of tape recorders, microphones and cameras. For approximately two weeks after Corona's arrest, newspapers and broadcast material describing the grisly discoveries and Corona's possible connection was voluminous and detailed. It permeated the immediate locale, pervaded the state and extended across the nation. News accounts were supplemented by a multitude of "local color" stories. Later steps in the judicial proceedings stimulated additional spurts of detailed, widespread publicity.

Corona was indicted on July 12. On July 22 the superior court issued an order directing law enforcement and court personnel and the attorneys to abstain from comment to the press. Ultimately counsel for Corona moved for a change of venue. At the hearing a number of witnesses testified and exhibits were introduced in evidence. We have before us a record which includes three volumes of transcribed oral testimony; twelve reels of television film containing composites of the daily news broadcasts; voluminous collections of clippings from the three daily newspapers and one weekly paper with widest readership in Sutter County; substantial files of clippings from all major and many smaller California newspapers, arranged alphabetically by county with separate folders for each paper. Also in evidence is the report of a public opinion survey conducted by a polling and marketing research firm employed by the defense; collateral documents designed to measure the accuracy of that firm's survey; the report of a court-directed re-survey of some of the persons polled by the firm; a public opinion survey conducted under the direction of the district attorney; finally, a number of

affidavits of individuals commenting upon the state of public opinion in regard to the case.

The Attorney General suggests that all the collected material is relevant to the venue question. We agree. In *Maine* v. *Superior Court, supra,* 68 Cal.2d at pages 383-384, the California Supreme Court approved the recommendation of the Reardon Report (fn. 1, *ante*), that the determination be based on " 'such evidence as qualified public opinion surveys or opinion testimony offered by individuals, or on the court's own evaluation of the nature, frequency, and timing of the material involved.' " The enumeration was not exclusive, and the court subsequently indicated the permissibility of oral testimony. (*Frazier* v. *Superior Court* (1971) 5 Cal.3d 287, 293 [95 Cal.Rptr. 798, 486 P.2d 694].) On occasion appellate de novo consideration may be handicapped when oral testimony is presented in transcribed form. The handicap is minimal where, as here, the witnesses' credibility is less important than the accuracy of their analysis.

In some highly publicized prosecutions a change of venue may be in order because pretrial publicity and accompanying conditions infect the community with hostility toward the suspect. This is not such a case. The news coverage was voluminous but not inflammatory. Generally, it portrayed Corona as a quiet, respectable family man and as a religious, hardworking individual. The record is empty of evidence of anti-Chicano prejudice in Sutter County. There is no evidence to justify the belief that Corona is the object of hatred or vengefulness in that county. The victims were not well-esteemed local people but relatively anonymous transients. (Cf. *Maine* v. *Superior Court, supra,* 68 Cal.2d 375; *Frazier* v. *Superior Court, supra,* 5 Cal.3d 287; *People* v. *Tidwell* (1970) 3 Cal.3d 62 [89 Cal.Rptr. 44, 473 P.2d 748].)

A reasonable likelihood of unfairness may exist even though the news coverage was neither inflammatory nor productive of overt hostility. (*People* v. *Tidwell, supra,* 3 Cal.3d at p. 70.) When a spectacular crime has aroused community attention and a suspect has been arrested, the possibility of an unfair trial may originate in widespread publicity describing facts, statements and circumstances which tend to create a belief in his guilt.

Indispensable to any morally acceptable system of criminal justice is a verdict based upon evidence and argument received in open court, not from outside sources.[2] When community attention is focused upon the sus-

---

[2] "Among these 'legal procedures' [essential to a fair adjudication of guilt] is the requirement that the jury's verdict be based on evidence received in open court,

pect of a spectacular crime, the news media's dissemination of incriminatory circumstances sharply threatens the integrity of the coming trial. The prosecution may never offer the "evidence" served up by the media. It may be inaccurate. Its inculpatory impact may diminish as new facts develop. It may be inadmissible at the trial as a matter of law. It may be hearsay. Its potentiality for prejudice may outweigh its tendency to prove guilt.[3] It may have come to light as the product of an unconstitutional search and seizure. If it is ultimately admitted at the trial, the possibility of prejudice still exists, for it had entered the minds of potential jurors without the accompaniment of cross-examination or rebuttal.[4]

■ The goal of a fair trial in the locality of the crime is practically unattainable when the jury panel has been bathed in streams of circumstantial incrimination flowing from the news media.[5] Questioned on *voir dire* as

not from outside sources." (*Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 351 [16 L.Ed.2d 600, 613, 86 S.Ct. 1507].)

" 'The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print. . . . When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied.' " (*Maine* v. *Superior Court, supra,* 68 Cal.2d at p. 384, quoting from opinion of Holmes, J., in *Patterson* v. *Colorado* (1907) 205 U.S. 454, 462-463 [51 L.Ed. 879, 881, 27 S.Ct. 556].)

[3]Section 352 of the California Evidence Code declares: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[4]In *Marshall* v. *United States* (1959) 360 U.S. 310 [3 L.Ed.2d 1250, 79 S.Ct. 1171], the court set aside a conviction where, during trial, the jurors were exposed by news media to information not admitted at the trial. The court observed that such information may be more prejudicial than the evidence brought in by the prosecution "for it is then not tempered by protective procedures." (360 U.S. at pp. 312-313 [3 L.Ed.2d at p. 1252].)

The Report of the Warren Commission (pp. 238-242) describes some of the dangers and perplexities created by media revelations of evidence which publicly incriminate a suspect before trial. See also Lewine, *What Constitutes Prejudicial Publicity in Pending Cases* (1965) 51 A.B.A.J. 942, reprinted in Selected Readings: Fair Trial—Free Press (Am. Jud. Soc. 1971) pages 55-69; Friendly and Goldfarb, Crime and Publicity (1967) pages 85-93.

[5]The present case demonstrates the limited utility of judicial restrictions on evidentiary disclosures by court personnel, attorneys and police. It also illustrates the impotence of ethical codes or standards promulgated by representatives of the bar and press. (See *Joint Declaration Regarding News Coverage of Criminal Proceedings in California,* reprinted in 45 State Bar J. 170-173 (1970).) When a newsworthy crime story breaks, these high-minded declarations fall flat before the competitive onslaughts of resourceful newsmen, bent on producing profitable merchandise wrapped in the gilt of constitutional freedoms. The social values of media crime reporting are real and undeniable. So are the social disadvantages. Pre-arrest and

to the effect of the media's evidentiary disclosures, one prospective juror may deny or admit awareness, another disclaim or admit prejudgment. One may falsely deny both knowledge and prejudice for the sake of a place on the jury. An honest juror may admit knowledge or tentative prejudgment and find himself excluded. Many will sincerely try to set aside their preconceptions and give assurance of impartiality, yet unconsciously bend to the influence of initial impressions gained from the news media.[6]

As we have observed, both the magistrate and the superior court judge issued orders designed to curb pronouncements by law enforcement officers, court personnel and attorneys. Despite general cooperation by the affected persons, these orders were ineffectual. They formed an impotent barrier, easily bypassed by the energetic digging of the news media. Pervasive and repeated press and television publicity was given to the following incriminatory revelations:

1. On May 26, according to the news media, the sheriff stated, "We're certain he committed the murders," and that all the victims had apparently died from blows delivered by an axe or a long, machete-type knife. The statement apparently occurred prior to the restrictive order issued by the magistrate. On all later occasions the sheriff exhibited strict allegiance to the letter and spirit of the order.

2. Filed with the magistrate on May 28 was a warrant under which Corona's home had been searched. The warrant, the sheriff's supporting affidavit and a return listing objects found in Corona's home were made available to newsmen.[7] The affidavit stated that two meat market receipts

post-trial publicity produce maximum advantage and minimal disadvantage. The pinch occurs during the period between the suspect's arrest and the time of the verdict. At this critical stage of the judicial process, no realistic accommodation of competing values can be attained without unwrapping the constitutional pretensions which enfold the media's profit motivations.

[6]Authoritative decisions now recognize the lack of realism inherent in expectations that jurors can insulate their verdict from inadmissible knowledge. (See *Bruton* v. *United States* (1968) 391 U.S. 123, 128-130 [20 L.Ed.2d 476, 480-482, 88 S.Ct. 1620]; *People* v. *Aranda* (1965) 63 Cal.2d 518, 525-526, 528-529 [47 Cal.Rptr. 353, 407 P.2d 265]; *Frazier* v. *Superior Court, supra,* 5 Cal.3d at p. 294.)

When prejudicial publicity has been injected into jurors' consciousness, the courts do not give dispositive effect to jurors' assurances of impartiality. (*Sheppard* v. *Maxwell, supra,* 384 U.S. at p. 351 [16 L.Ed.2d at pp. 613-614]; *Marshall* v. *United States, supra,* 360 U.S. at pp. 312-313; *Irvin* v. *Dowd* (1961) 366 U.S. 717, 724-725 [6 L.Ed.2d 751, 756-757, 81 S.Ct. 1639].)

"To expect a juror to confess prejudice is not always a reliable practice. A juror can be completely honest in denying prejudice. In the words of Alexander Pope, 'All looks yellow to the jaundiced eye.'" (*State* v. *Shawan* (1967) 77 N.M. 354, 358 [423 P.2d 39, 42].)

[7]Newspaper accounts stated that the magistrate had decided to release the documents to the press because, once filed, they became public records and could not be

bearing Corona's name had been found in one of the graves. It declared a belief that the murders were the work of a homicidal maniac. It referred to a police report that Corona had been suspected of attacking a man with a meat cleaver a year earlier. The list of objects found in Corona's home included a posthole digger marked with mud, hair and possible bloodstains; a bolo machete, hatchet and similar tools. Newspaper and television broadcasts reported on the find as supplying the first physical evidence linking Corona to the killing.

3. News reports on May 29 and thereafter referred to Corona as a "former mental patient." They recounted that he had been committed to a state hospital in 1956 as a dangerous schizophrenic and released after three months; that he had fits of temper; that he had beaten his wife; that he had little use for white, transient laborers. According to one report his fits of temper were so violent that he had to be tied down with ropes.[8]

4. News reports publicized the statement of a transient worker named DeLong, who was held as a "material witness" by the authorities. According to DeLong, he had been with one of the victims, Beierman, on March 26 or 27, when Corona had driven up in his truck, stopped and picked up Beierman for a job. DeLong was quoted as stating, "That's the last time I ever saw that guy [Beierman]. He was one of the best guys I ever knew."

5. A fresh outburst of incriminatory revelations occurred in three copyrighted reports published in the Sacramento Bee on June 4 and June 5. These reports, ascribed to "official sources in Sacramento," described a "mass murder list" in a small ledger book found in Corona's home. The list, according to the copyrighted stories, contained the names of 34 alleged victims, the dates on which they were "presumed" murdered and designations of the burial sites. Although the district attorney and the sheriff of Sutter County refused comment, the article quoted unnamed officials who were "completely convinced" that the list was a compilation of murder victims. "Official sources" also revealed the discovery of a nine-millimeter bullet in the body of one of the victims. Bullets of the same caliber had been found in Corona's van. The copyrighted stories supplied the names and dates on the alleged murder list. One of the June 5 dis-

---

withheld lawfully. Penal Code, section 1534, provides in part: ". . . The documents and records of the court relating to the [search] warrant need not be open to the public until the execution and return of the warrant or the expiration of the 10-day period after issuance. Thereafter, if the warrant has been executed, the documents and records shall be open to the public as a judicial record."

[8]As we view the matter, public awareness of petitioner's history of mental illness and emotional instability (if any) had an incriminatory impact, however circumstantial, because it might explain an otherwise senseless series of killings.

patches mentioned another list found in Corona's home, this one containing the names of eight possible murder victims, written on the back of a Mexican immigration form "in what may be the killer's handwriting." References to the Sacramento Bee assertions appeared in other newspapers and in television news broadcasts.

6. News reports of June 7 linked the late 1969 discovery of the hacked and stabbed body of an unidentified victim in Tehama County to Corona's presence in Tehama County about that time. Referring to the "murder list" found in Corona's home, the Sheriff of Tehama County was quoted as follows: "Keep your eye on the No. 1 name on that murder list. Remember the date. That ought to be our man."

7. News reports of June 9 reported tire tracks near one of the orchard graves as matching those of a vehicle owned by Corona. They mentioned two Bank of America deposit receipts bearing Corona's name, found when the 24th body was unearthed. They mentioned a second "material witness" who had seen one of the victims with Corona shortly before the victim's disappearance. They repeated the reference to a machete found in Corona's home.

One phase of the public opinion poll conducted for the defense reveals the obvious—that most of the adults in Sutter County were deeply absorbed in the shocking progression of discoveries. The provocative character of these discoveries could only intensify the impact of media revelations implicating Corona. Few veniremen in Sutter County can now deny some foreknowledge of these revelations. Each would be asked to carve this knowledge from his consciousness and resort only to what he heard in court. Most prospective jurors would sincerely express their willingness to do so. Their ability to do so is dubious at best, nonexistent at worst.[9] Our law clothes Corona, like other accused, in a presumption of innocence. In the minds of many, the media have stripped him of that presumption, and he must now disprove his guilt.

Corona's trial will signal a renewed freshet of publicity. Sutter County jurors will recognize that a large segment of national attention is focused on their community. Twenty-five slayings took place there without a ripple of public awareness. To some extent the community's reputation for peace and security will depend upon a solution of the mystery. Understandably sensitive to community reputation, local jurors will feel a sense of community involvement transcending their strict juridical function.[10] There is a

---

[9]See footnote 6, *ante.*

[10]On May 31 the Mayor of Yuba City was quoted: "This really gives us a black eye. It is very unfortunate that this would have happened on our side of the river.

danger that external factors of that sort will influence the trial despite honest efforts to eradicate them. The massive outpouring of incriminatory publicity in the commercial news media and the potential intrusion of community involvement external to the judicial process have created a reasonable likelihood of an unfair trial in Sutter County.

In reaching this conclusion we have not ignored the two public opinion surveys received by the trial court, one conducted by an independent research firm employed by the defense, the other by the district attorney's office. ██ The California Supreme Court has extended approval to the use of qualified public opinion surveys as adjuncts to the venue determination.[11] We take it that the term "qualified" means only that the survey be well-conceived, impartially conducted and accurately recorded. So qualified, a survey should be acceptable even when it is conducted (as it usually is) at the behest and expense of an interested party.

We are indebted to the Attorney General for an able and dispassionate analysis of the public opinion surveys. The polling firm retained by the defense conducted a telephone canvass which presented a prepared questionnaire to a random selection of 411 registered voters of the county. The district attorney's staff conducted a door-to-door canvass of 30 members of the 1970 jury list of Sutter County selected at random.

We find that both polls are inconclusive; that neither one supports or detracts from our conclusion. Aside from polling methods which open possibilities of mathematical error, the principal objection is to the concept underlying both polls. The prime questions—whether the individual held an opinion as to Corona's guilt and whether he believed he could give Corona a fair trial—were addressed to the sample by telephone or door-to-door canvassers under conditions differing widely from courtroom examination under oath and under stress of personal responsibility. Under the conditions of the canvass, an assurance of impartiality was apt to mask wishful thinking, an admission of prejudice apt to express honest self-analysis. In the relatively rootless environment of the survey, sincere assurances of impar-

---

They have had problems on the other [Marysville] side of the river but we have a real clean town. No Skid Row here, no winos . . . . Whether they were winos or not, a life is a life and it shouldn't have happened." Later news stories described an angry reaction toward the mayor by the Board of Supervisors of Yuba County (across the river). Published letters to the editor indicated citizen resentment toward the mayor's remarks.

[11]*Maine* v. *Superior Court, supra,* 68 Cal.2d at page 383; Reardon Report (fn. 1, *ante*) pages 125-126.

The techniques of opinion polling, evidentiary problems and methods of critical analysis are discussed in Roper, *Public Opinion Surveys in Legal Proceedings* (1965) 51 A.B.A.J. 44; Sherman, *The Use of Public Opinion Polls in Continuance and Venue Hearings* (1964) 50 A.B.A.J. 357; Note, 66 Harv.L.R. 498 (1953).

tiality might ignore personal awareness of specific pieces of incrimination. From the perspective of our conclusion—which bases venue change on the pretrial publication of incriminating evidence—neither poll addressed the appropriate questions to the entire sample, i.e., what evidentiary revelations spread by the news media were in the minds of the sample?

The Attorney General charges the defense with invited error. Corona's present attorney entered the case on June 14, replacing the Sutter County public defender. The charge of invited error stems from publicized statements and interviews by the attorney, assertedly in violation of the superior court's restrictive order. In the context of fundamental assurances of a fair trial, the doctrine of invited error has limited application. (*Fain* v. *Superior Court, supra,* 2 Cal.3d at p. 53.) Here, the defense-created publicity occurred after the news media's emission of incriminatory publicity, neither aggravating nor diminishing the harm created by the latter. The trial court has effective means of controlling future effusions by the defense, if any. (See *Sheppard* v. *Maxwell, supra,* 384 U.S. at p. 361 [16 L.Ed.2d at p. 619].)

The Attorney General correctly points out that newspaper and television publicity pervaded not only Sutter County but the entire state as well. He suggests that any prejudice created by news reports will characterize jury panels in other counties. ■ At this point community population becomes a factor. The potential of community bias mounts in direct ratio to the pervasiveness of publicity.[12] Delay may counteract publicity in medium-size and larger cities, but in small communities, where a major crime becomes embedded in the public consciousness, the effectiveness of delay is diminished. (*Maine* v. *Superior Court, supra,* 68 Cal.2d at p. 387.) In counties more populous than Sutter County, the public memory of harmful publicity will be relatively blurred by the passage of time. In counties geographically removed from the locale of the crime, lack of a sense of community involvement will permit jurors a degree of objectivity unattainable in that locale. Potential jurors in an urban area will be less vulnerable to claims of insensitivity toward migratory farm workers. Local consciousness of the community's reputation for peace and security will be eliminated. If perfection is not within reach, optimum conditions are.

Let a peremptory writ of mandate issue directing the Superior Court of Sutter County to grant the motion for change of venue, hold a hearing to

---

[12]See *Sheppard* v. *Maxwell, supra,* 384 U.S. at pages 335, 353-356 [16 L.Ed.2d at pages 604, 614-616]; *Lewine, op. cit.,* Selected Readings: Fair Trial—Free Press, at pages 62-63.

determine a place where a fair and impartial trial can be had, and transfer the cause to that place.

Regan, J., and White, J.,* concurred.

The petition of the real party in interest for a hearing by the Supreme Court was denied June 7, 1972.

---

*Assigned by the Chairman of the Judicial Council.