## Commonwealth v. Stouffer, Appellant.

Argued March 12, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, SPAULDING, CERCONE, and SPAETH, JJ.

*Jerome T. Foerster,* with him *Smith, Fox, Roberts, Foerster & Finkelstein,* for appellant.

*John R. Walker*, District Attorney, with him *Edwin D. Strite, Jr.*, Assistant District Attorney, for Commonwealth, appellee.

OPINION PER CURIAM, June 21, 1973:
Judgment of sentence affirmed.

---

DISSENTING OPINION BY HOFFMAN, J.:

Appellant contends that his motion for a change of venue should have been granted, and that widespread pretrial publicity deprived him of a fair trial in Franklin County.

Appellant was charged with ten counts of uttering forged instruments. After two continuances, a jury was impanelled on May 5, 1967. The Court declared that trial would not be held until May 25, 1967, and excused the jury warning them not to discuss the case with anyone or read anything concerning the case in the interim period before trial.

From April 27, 1967 until May 26, 1967, numerous articles in the local newspapers and radio broadcasts reported the facts of the impending trial and apprised the community that appellant had been convicted in Maryland for "related crimes".[1] After a number of these front-page articles appeared, see footnote 1, appellant applied for a change of venue on May 12, 1967.

---

[1] The following headlines and excerpts illustrate the content and probable impact the local media had on the public-at-large:

(April 27, 1965)—"MAN FACING TRIAL HERE CONVICTED IN MARYLAND"—front page story appearing in Chambersburg newspaper. The article reported that appellant was scheduled for trial on May 5th in Franklin County (Chambersburg) Court House on passing forged promissory notes. The article stated that appellant had been convicted in Frederick County, Maryland on related fraud charges. It further reported that appellant was scheduled for trial on May 17th in Washington County, Maryland on three charges of forgery, stating: "So complete was the case against Stouffer in the Fred-

A hearing was held on May 19, 1967, at which the application was denied. Appellant argued that he could not obtain a fair trial as a result of the wave of publici-

erick Courts that the Court Reporter was unprepared to take the jury's findings when it returned in only several minutes."

(May 1, 1965)—article in "Public Opinion", a local newspaper, reported that appellant had appeared twice in court without counsel. It also stated: ". . . it has been reported that one bank alone, the Citizens National Bank of Waynesboro, has been *duped* out of several hundred thousand dollars through its transactions with Stouffer."

(May 5, 1967)—"COUNSEL NAMED FOR STOUFFER"—article in "Public Opinion" reported that counsel had been appointed for Stouffer who had built a $1.8 million empire, and now was "declared indigent". It reported again the circumstances of the Maryland conviction.

(May 6, 1967)—"BOND REVOKED, ACCUSED JAILED"—article in "Public Opinion" rehashed previous news stories, and reported that appellant was jailed; further, it recounted the Frederick County conviction and the charges in Washington County, Maryland.

(May 9, 1967)—"CASH BOND POSTED FOR MARYLAND MAN"— "Public Opinion" article; same story of Maryland "related crimes": reported that despite "indigence", appellant posted bail and reported by whom and how cash bond was posted.

(May 10, 1967)—"STOUFFER FREE ON $10,000 BAIL"—"Public Opinion" article on bail; attacked appointment of Public Defender as further exploitation and fraud of appellant "at the expense of county tax-payers."

(May 11, 1967)—"STOUFFER JAILED TO AWAIT TRIAL AS BOND IS REVOKED"—"Echo Pilot", a local newspaper, reported facts virtually identical to stories by "Public Opinion".

(May 18, 1967)—"DEFENDANT PROTESTS"—"Public Opinion" reported appellant's application for a change of venue; also reported that the charges in Franklin County were for passing notes involving nearly $100,000 in losses to a bank in Waynesboro.

(May 20, 1967)—"COURT DENIES VENUE CHANGE FOR STOUFFER" —"Public Opinion" article reported the proceedings in court, quoting both the District Attorney and the Trial Judge. It recounted the circumstances of the arrest, bail proceedings, jailing, and open charges against appellant.

(May 25, 1967)—"CHARGE PRESSED AGAINST STOUFFER"—"Public Opinion" article described events of first day of trial, reviewing the testimony of all the Commonwealth witnesses.

ty, certain to inflame and sway the minds of the public, and particularly the jurors. He contended that the prejudice caused by these articles destroyed the impartiality of the community in which he was to stand trial. The trial court reasoned that it had adequately warned the jurors not to read or discuss anything in connection with the case. It concluded: "We cannot talk in abstract. The fact that the articles appeared in the newspapers is not in question . . . what you have to prove is that the articles prejudiced the jury. . . . If you are not prepared to prove prejudice, we cannot grant the motion."

Trial was held on May 25 and 26, 1967, before the jury which had been impanelled almost three weeks prior thereto. Prior to the opening remarks of counsel, the trial judge asked the jurors if they had read or heard anything about the case or about the defendant. They replied in the negative. A request by defense counsel to voir dire the jurors was denied, and the trial proceeded. After the close of all the testimony, the jury returned a verdict of guilty on all counts. Post-trial motions were denied, and this appeal followed.

The United States Supreme Court has spoken emphatically on the question of protecting the defendant's right to a fair trial in the face of prejudicial publicity, either during or before the trial. *Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Marshall v. United States*, 360 U.S. 310 (1959). The problem of prejudicial publicity can arise in many different ways. Exact parallels with

---

(May 26, 1967)—"STOUFFER JURY VERDICT EXPECTED TODAY, MARYLAND MAN'S TRIAL."—"Morning Herald", a Hagerstown, Maryland newspaper allegedly circulated in Franklin County, reported the proceedings in Franklin County as well as the Frederick County and Washington County "related crimes".

factual situations presented by other cases is difficult, and it is for this reason, that "appellate tribunals have the duty to make an independent evaluation of the circumstances" of each case. See, *Sheppard v. Maxwell*, supra at 362.

In examining the facts of a particular case, it is essential that the jury make its decision solely on the basis of the evidence offered in open court. While courts should be ever diligent in shielding juries from prejudicial publicity, it must be recognized that in some cases widespread news coverage is inevitable. It then becomes necessary for the trial court to balance the right of the press to gather and report the news against the prejudice to the accused. This delicate procedure must be done on an *ad hoc* basis.

As the United States Supreme Court said in *Sheppard*, supra at 362: "From the cases coming here we note that unfair and prejudicial news comment on pending trials has become increasingly prevalent. Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused . . . . Of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom. *But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial,* the judge should continue the case until the threat abates, or transfer the case to another county not so permeated with publicity. In addition, sequestration of the jury [is] something the judge should [raise] sua sponte with counsel. If publicity during the proceedings threatens the fairness of the trial, a

new trial should be ordered." See also, *Irvin v. Dowd,* 366 U.S. 717 (1961).[2]

In *Marshall v. United States,* supra, the United States Supreme Court granted a new trial to a defendant who was convicted of dispensing drugs without prescription. The Court noted that jurors had become cognizant of certain pretrial newspaper stories about the defendant which reported the facts and circumstances of two previous felony convictions. Defendant, during trial, did not take the stand or offer any evidence on his behalf. The prosecution would have been barred from offering into evidence any reference to defendant's prior criminal record. The Supreme Court at 312-313 stated: "The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence. . . . It may indeed be greater for it is then not tempered by protective procedures."

It is not always possible for a defendant to prove that jurors have read published reports or heard anything of a prejudicial nature. It is often the case that

---

[2] The United States Supreme Court has pointed out that: "Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges v. State of California,* 314 U.S. 252, 271 (1941). The Court has insisted that no one be convicted of a crime unless there has been "a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement and tyrannical power." *Chambers v. State of Florida,* 309 U.S. 227, 236-237 (1940). While "[f]reedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice", *Pennekamp v. Florida,* 328 U.S. 331, 347 (1946), it must not be allowed to jeopardize the "very purpose of a court system . . . to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures." *Cox v. Louisiana,* 379 U.S. 559, 583 (1965) (BLACK, J., dissenting). Among these "legal procedures" is the requirement that the jury base its decision on evidence received in open court and not from outside sources: *Sheppard,* supra at 351.

they will deny such knowledge upon being questioned by the trial judge or, at most, admit having read something but assert that said knowledge will not bear upon or influence their decision. The *Sheppard* case and cases following it have recognized the impossibility of placing the burden upon the movant to demonstrate actual prejudice. As the United States Supreme Court said in *Estes v. State of Texas*, 381 U.S. 532, 542-543 (1965), "It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." In *Sheppard*, the Court pointed to the "carnival atmosphere" of the courtroom; the "massive and pervasive" media coverage; the sensationalism attached to the defendant, his trial counsel, and the crime itself; and, the fact that the jury was not sequestered during the trial. As the Court stated at 352: "It is clear that the totality of circumstances in this case also warrants such an approach [potential prejudice as sufficient to reverse]. Unlike Estes, Sheppard was not granted a change of venue to a locale away from where the publicity originated; nor was his jury sequestered."

Until recently, our courts had been reluctant to grant a motion for a change of venue or declare a mistrial absent a showing by the accused that "identifiable prejudice" resulted from the pretrial or contemporaneous publicity. *Commonwealth v. Hoss*, 445 Pa. 98, 283 A. 2d 58 (1971); *Commonwealth v. Swanson*, 432 Pa. 293, 248 A. 2d 12 (1968); *Commonwealth v. Lopinson*, 427 Pa. 284, 234 A. 2d 552 (1967). Those cases have turned on such factors as a finding that voluminous news accounts were only factual; that the jurors denied having read or heard about the circumstances sur-

rounding the crime or that they said they had not formed opinions as to appellant's guilt; that publicity might not have reached the attention of potential jurors in a densely populated area; that publicity occurred well in advance of the trial; or, where defense counsel was permitted extensive *voir dire* examination of jurors.

Other states considering the problem of prejudicial publicity, have followed the standard enunciated in *Sheppard*, i.e., that the existence of a "reasonable likelihood that prejudiced news prior to trial will prevent a fair trial," and not actual prejudice. *Maine v. Superior Court of Mendocino County*, 66 Cal. Rptr. 724, 438 P. 2d 372 (1968); *Scott v. State*, (Okl. Cr. 1969) 448 P. 2d 272; *Lloyd v. District Court of Scott County*, (Iowa, 1972) 201 N.W. 2d 720; *Pollard v. District Court of Woodbury County*, (Iowa, 1972) 200 N.W. 2d 519.

In the landmark case of *Maine v. Superior Court of Mendocino County*, supra, the California Supreme Court directed a change of venue in a case arising from a brutal assault on a teen-age couple in a small community of 9,900 residents, in a county the population of which numbered 51,200. The Court noted that public sympathy had been aroused. Furthermore, local newspapers reported that one of the defendants had confessed and that the petitioners were charged with crimes committed in the State of Washington. The Court held at 380:

"We do not assert categorically that each individual circumstance here, isolated and alone, would compel a change of venue. . . . Generally no single indicium is available as a barometer of the public mind.

"We hold that where, as here, the defendants are friendless in the community, the victims prominent, the occurrence of the crime probably fortuitous as to locale, community-wide interest and generosity are ex-

pressed on behalf of the victim, newspaper publicity includes accounts of a purported confession, and two opposing counsel are also election opponents, a change of venue is clearly necessary to assure a fair trial to the defendants." See also, *Pamplin v. Mason*, 364 F. 2d 1 (5th Cir. 1966).

In *Maine* and the other cited cases, supra, there was no actual showing of prejudice nor evidence that the publicity had reached all potential or impanelled jurors.

In response to *Sheppard*, supra, and other cases on the subject, the American Bar Association approved the following standard: "A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. This determination may be based on such evidence as qualified public opinion surveys or opinion testimony offered by individuals, *or in the court's own evaluation of the nature, frequency, and timing of the material involved. A showing of actual prejudice shall not be required.*" A.B.A. Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press, §3.2(c) (1968) (emphasis added).

In demonstrating "potential" prejudice, appellant must show one or more of the factors recognized in the above-mentioned cases. These include such considerations as the volume of publicity; the proximity of the publicity to the date of trial; the content of said publicity, e.g., the inclusion of opinionated and inflammatory matter on the question of the morals, reputation or guilt of the accused, or revelations of "prior crimes"; the size of the community receiving the publicity and from which the jury will be selected; the date the jury is impanelled and whether trial is delayed for a long

period of time; the sequestration of the jury; the existence of extensive and exploratory investigation by either the trial judge or counsel into the permeation of published or broadcasted facts into the minds of the jurors; and, the atmosphere of the courtroom during trial.

The instant case does not involve the degree of sensationalism and in-court antics that occurred in either the *Sheppard* or *Estes* cases. It does reflect a community awareness of appellant's personal, financial and criminal history. The evidence discloses a front-page and prime-time media saturation of appellant's story. The publicity not only is factual in nature, but presents appellant as a convicted forgerer and defrauder, a builder of financial empires at the expense of people like "Franklin County taxpayers". The newspaper stories go into great detail on the facts and circumstances of appellant's prior convictions and open charges in Maryland. The publicity is concentrated primarily in Chambersburg, wherein the Franklin County Court House is located and wherein appellant was tried. The publicity occurred during a period beginning April 27 and concluding May 26, 1967 (the jury was impanelled May 5 and trial was conducted May 25-26, 1967). The community of Chambersburg numbers 17,315; while, the entire population of Franklin County is only 100,833.[3] The impanelled jury was permitted to go home for a period of 20 days prior to convening for trial. Upon their return, the court merely asked if anyone had read or heard anything about the trial. Defense counsel was denied a request for a *voir dire* examination of the jurors with regard to pretrial publicity.

Considering these factors, I believe that the instant case must be reversed. Unlike *Commonwealth v. Hoss,*

---

[3] U. S. Census Bureau Statistics (1970).

supra, which involved publicity more than five months prior to trial in a municipality numbering 1½ million residents and where *voir dire* was permitted, this case arose in a small community exposed to a barrage of publicity just prior and during trial. "Population, [qua population], is not alone determinative; it is but one factor and it must be shown how size, whether of area or of population, neutralizes or dilutes the impact of adverse publicity." *Lansdown v. Superior Court of Kern County*, 89 Cal. Rptr. 154, 10 Cal. App. 3d 604 (1970) ; cf. *People v. Gambino*, 12 Ill. 2d 29, 145 N.E. 2d 42 (1957) (mistrial motion denied, where defendant was unable to show that in a city the size of Chicago publicity had been read by one or more of the jurors; reasonable likelihood not proven). It is "reasonably likely" that publicity surrounding this case reached the jurors of Franklin County.

The question then becomes whether the publicity in itself was prejudicial or inflammatory so as to deny appellant a fair and impartial trial. The tenor of the front-page articles and the editorial innuendos are in my opinion, prejudicial and inflammatory. An examination of the published matter discloses a detailed account of a prior conviction and an open charge in the State of Maryland for "related crimes". The articles report that the defendant was a builder of financial empires through fraud on innocent victims. The articles depict defendant as a "convicted man" and a "swindler" of "county taxpayers". They label the defendant as the "Maryland Man", and suggest that his crime is compounded by fraudulently obtaining a Public Defender. The net effect is that defendant's prior criminal activity tends to affect guilt determination on the pending charge in Franklin County. This is accomplished by editorial fiat with evidence untested in the courtroom and inadmissible at trial.

A number of jurisdictions have held that published references to prior criminal activity of a defendant or even his co-defendants, arrested on the same offense, are so highly prejudicial that a new trial is required. *Griffin v. Superior Court for County of Stanislaus,* 103 Cal. Rptr. 379, 26 Cal. App. 3d 672 (1972) (news accounts of defendant's two prior convictions held prejudicial); *Worcester Telegram & Gazette, Inc. v. Commonwealth,* 238 N.E. 2d 861, 354 Mass. 578 (1968). (Held that report that one defendant was serving a sentence in the State prison reflected upon the other co-defendants as to prejudice their subsequent trial); *United States v. McKinney,* 429 F. 2d 1019 (5th Cir. 1970). (Disclosure of appellant's attempted escape from confinement prior to trial held prejudicial).

As one Court opined: "The prosecution may never offer the 'evidence' served up by the media. It may be inaccurate. Its inculpatory impact may diminish as new facts develop. It may be inadmissible at the trial as a matter of law. It may be hearsay. Its potentiality for prejudice may outweigh its tendency to prove guilt. . . . If it is ultimately admitted at the trial, the possibility of prejudice still exists, for it had entered the minds of potential jurors without the accompaniment of cross-examination or rebuttal." *Corona v. Superior Court,* 101 Cal. Rptr. 411, 415, 24 Cal. 3d 872, 878 (1972).

The companion cases of *Commonwealth v. Pierce* and *Commonwealth v. Jones,* filed March 16, 1973 by the Pennsylvania Supreme Court,[4] illustrate the parameters of permissible news coverage associated with a crime, and are applicable to the instant case. In *Jones,* the Court found that the articles which reported the investigation of the crime in a factual manner and

---

[4] *Commonwealth v. Pierce,* 451 Pa. 190, 303 A. 2d 209 (1973); *Commonwealth v. Jones,* 452 Pa. 299, 304 A. 2d 684 (1973).

which did not clearly disclose appellant's complicity in the matter, were not prejudicial. In *Pierce,* dealing with the same incident, the Court held that news coverage as affecting Pierce was prejudicial requiring a new trial. The Court determined that a televised "re-enactment" of the crime along with newspaper stories disclosing appellant's prior arrests and convictions, and confession, were "inherently prejudicial". In the Majority Opinion by Justice EAGEN, the Court held that "the nature of the accounts . . . were so 'inherently prejudicial' that Pierce need not have shown a nexus between the publicity and actual jury prejudice, and hence, he did not have the burden of showing identifiable prejudice." 452 Pa. at 195. In so deciding, our Supreme Court followed the clear meaning of *Sheppard,* supra, and its progeny that where the content and tenor of media coverage is so prejudicial that there is a "reasonable likelihood" that the effect of said publicity will deprive the defendant of a fair and impartial trial, actual prejudice need not be shown to warrant a change of venue or a new trial.[5]

The Commonwealth contends that even if the publicity was prejudicial and appellant not required to prove actual prejudice, the response of the impanelled jurors that they had read or heard nothing concerning the crime or appellant's history dispelled that "reason-

---

[5] It is interesting to note at least one appellate court has held that a change of venue is mandated even when the content of the published matter is not prejudicial or inflammatory, but only factual. *State v. Corona,* supra. As the California Supreme Court said at 414-415: "A reasonable likelihood of unfairness may exist even though the news coverage was neither inflammatory nor productive of overt hostility. When a spectacular crime has aroused community attention and a suspect has been arrested, the possibility of an unfair trial may originate in widespread publicity describing facts, statements and circumstances which tend to create a belief in his guilt." (Citations omitted).

able likelihood", and placed the burden on appellant to demonstrate identifiable prejudice. In meeting this argument, I am guided by the astute observations of the California Supreme Court in *Corona v. Superior Court,* supra, where at 415-416, the Court stated: "The goal of a fair trial in the locality of the crime is practicably unattainable when the jury panel has been bathed in streams of circumstantial incrimination flowing from the news media. Questioned on *voir dire* as to the effect of the media's evidentiary disclosures, one prospective juror may deny or admit awareness, another disclaim or admit prejudgment. One may falsely deny both knowledge and prejudice for the sake of a place on the jury. . . . Many will sincerely try to set aside their preconceptions and give assurance of impartiality, yet unconsciously bend to the influence of initial impressions gained from the news media."

In the instant case, the trial judge merely asked the jury if any member had read or heard anything about the case. Failure of any juror to speak up was interpreted as a negative response. Defense counsel's request for *voir dire* examination was denied. Under the circumstances of this case, I believe the trial court erred in refusing counsel the right of *voir dire*.[6]

---

[6] The value of *voir dire* examination is well-established. As one federal court declared: "The chief significance of the voir dire examination, . . . is that it reflect[s] the climate of the courtroom and the pulse of the community in which petitioner was brought to trial. The community being a relatively small one, its pulse was more sensitive than might have been the case in a larger community to such influences as disclosure of petitioner's alleged criminal record; . . . and the saturation coverage of the community with stories about the fire, petitioner's complicity in the alleged crime and the State's investigation of the crime." *United States v. Smith,* 200 F. Supp. 885, 905 (D.C. Vt. 1962). Our Supreme Court has held that where there is evidence of prejudicial publicity, especially where there is disclosure of appellant's prior criminal record or a clear indication of complicity, the trial court must take steps to

There was a "reasonable likelihood" that at least one juror had been exposed to the extensive media coverage of the crime. The publicity revealed not only the stories relating to the investigation and prosecution of the incident, but it fully disclosed appellant's prior criminal record, thereby creating an impression of guilt in the minds of the public. As I have already said, even under the existing decisional law, voluminous prejudicial publicity of this type circulated through a small community prior and during the trial would in itself require a reversal.

The impact of this publicity was magnified by the fact that the jury, impanelled almost three weeks prior to trial, was permitted to go home. Furthermore, the jury was not sequestered during the trial itself when additional published reports recounted appellant's prior convictions. Once the jury was impanelled, and each juror knew that he was to decide the fate of Mr. Stouffer on May 25th, attention was inevitably drawn to this man and the crime for which he was charged. It is inconceivable that twelve jurors, permitted to move about freely in their community for three weeks, read or heard absolutely nothing concerning either appellant's history or the case. If due process demands a change of venue when it appears that an impartial jury, free of prejudicial publicity, cannot be drawn from the community, it is even more compelling that a change of venue be granted when an impanelled jury is exposed to pretrial publicity.[7]

---

insure that the trial will not be prejudicial. "One such step . . . [is] to permit the appellant to conduct voir dire of each juror on an individual basis outside the hearing of the other prospective jurors." *Commonwealth v. Johnson*, 440 Pa. 342, 351, 269 A. 2d 752 (1970).

[7] At least one court has held that a 62-day period between selection of a jury and trial is per se reversible error. *State v. White*, 274 A. 2d 690, 129 Vt. 220 (1971). Such a delay, the Vermont

I would, therefore, grant appellant a new trial before a jury chosen from a county uninfluenced by prejudicial pretrial publicity.

SPAULDING and SPAETH, JJ., join in this dissenting opinion.

---

Supreme Court held, vitiated the impartiality of the jury. The Court reasoned: "But when dealing with the integrity of the jury the party claiming the abuse has only to show the existence of circumstances capable of prejudicing the deliberative function of the jury. He is not required to prove that they actually did so." 274 A. 2d at 694.

While there may be circumstances where a delay in trial is necessary, it does not appear any such extenuating reason exists in the instant case. If not dispositive of the issues, the delay of nearly three weeks is a crucial factor in the case. Such a delay in deliberation following jury impanelling must be viewed with suspicion and close scrutiny.