[Civ. No. 1735. Fifth Dist. July 11, 1972.]

DONALD PAUL GRIFFIN, Petitioner, v.
THE SUPERIOR COURT OF STANISLAUS COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Michael Korn for Petitioner.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Daniel J. Kremer and James T. McNally, Deputy Attorneys General, for Respondent and for Real Party in Interest.

## OPINION

**BROWN (G. A.), J.**—Petitioner, Donald Paul Griffin, seeks writs of mandamus and prohibition directed to the Superior Court of Stanislaus County after denial by that court of multiple pretrial motions on the eve of his second trial on a murder charge. He also seeks reversal of the trial court's order fixing bond for petitioner in the sum of $150,000 cash or corporate surety or $300,000 personal undertaking.

On August 22, 1969, petitioner was found guilty of first degree murder by a jury and he was sentenced to life imprisonment by the court (Pen. Code, § 190.1). His appeal to this court resulted in the judgment of conviction being reversed for errors grounded on the court's failure to have given certain instructions *sua sponte*. (*People* v. *Griffin*, 18 Cal.App.3d 864 [96 Cal.Rptr. 218], filed July 22, 1971.)

Petitioner filed four motions in the trial court. They were:

1. A motion to change venue from Stanislaus County.

2. A motion to exclude as witnesses on behalf of the prosecution at petitioner's retrial those witnesses disclosed to the prosecution by petitioner's former counsel.

3. A motion pursuant to Penal Code sections 1538.5 and 1540 to suppress evidence obtained pursuant to search warrants.

4. A motion to suppress certain incriminatory statements taken by the police from petitioner allegedly in violation of his *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].)

All motions were denied. We shall consider them seriatim.

### CHANGE OF PLACE OF TRIAL

The victim of the murder for which petitioner was convicted was one Albert Zamlich, a resident of Sunnyvale, Santa Clara County. His body was found in Del Puerto Canyon, a remote mountainous area just over the Stanislaus County line, on the early morning of May 28, 1969. At the time petitioner was a resident of Santa Clara County. However, he had spent his youth in Stanislaus County. His mother, his present stepfather and grandparents reside in Livingston. When 14 years of age, in 1953, in Modesto, he shot and killed his stepfather. He was found criminally responsible for that act and served time in the Youth Authority. In 1958 he was convicted of the brutal, unprovoked assault with a hammer on another person who was not acquainted with petitioner. Though the victim's skull was crushed and he was near death for a time, he did not lose his life, though he has never fully recovered. As a result of the latter incident the petitioner served 10 years in the penitentiary. He had been out about six months at the time of the Zamlich homicide.

Because petitioner went through a penalty trial after his conviction of murdering Zamlich at the first trial, the sordid details of these prior offenses and petitioner's personal history were fully aired before a jury. They were reported in the widely circulated newspaper, The Modesto Bee, on almost a daily basis.

A Modesto pathologist who examined the body of the victim shortly after it was discovered was quoted by The Modesto Bee on May 28, 1969, as having described the slaying as "the most brutal and calculated I have ever seen" and "Torture has to be considered." The victim had a wound resulting from firing a .38 caliber revolver jammed into the ear canal and three additional bullet wounds in the body. He also had a wound which appeared to result from ramming a sharp instrument into the other ear canal until it reached bone.

In support of the motion to change the place of trial, petitioner has submitted a total of 40 news clippings taken from The Modesto Bee, the principal newspaper in Stanislaus County. Eleven of the articles are dated between 1953 and October 1958 and relate to the earlier crimes. Because of their remoteness, they are obviously of little significance with respect to the current motion.

Between the date of petitioner's arrest on May 29, 1969, until his conviction and sentencing on September 14, 1969, there were 24 articles published, covering 307½ column inches, not including headlines. Of these, 11 included reference to and discussion of petitioner's 1953 and 1958 convictions and his history of criminality. There can be little question

that during August 1969 petitioner's trial was one of the major news events in Modesto and Stanislaus County. All details of the trial, conviction and sentencing were reported on a day-to-day basis. When the trial court pronounced sentence, the paper carried a front page article with a large headline followed by the word "Bulletin."

Between September 4, 1969, through March 2, 1972, there were five articles published, four of which included commentary concerning the 1953 and 1958 convictions, two of which included reference to evidence which was ruled inadmissible at the first trial and four of which discussed in some detail his 1969 conviction; two referred to this court's reversal of the 1969 conviction.

■ In approaching the motion to change venue on the ground of prejudicial pretrial publicity, we refer briefly to some of the principles established by the cases. A succinct statement of the criteria to be followed was stated by this court in *Lansdown v. Superior Court* (1970) 10 Cal.App. 3d 604, at page 609 [89 Cal.Rptr. 154]: "The standard against which we measure the record is articulated in *Fain v. Superior Court*, 2 Cal.3d 46, 51 [84 Cal.Rptr. 135, 465 P.2d 23]: 'In making that appraisal the courts must now apply the standard we adopted in *Maine* (at p. 383): " 'A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a *reasonable likelihood* that in the absence of such relief, a fair trial cannot be had . . . . A showing of actual prejudice shall not be required.' " ' "

"Reasonable likelihood" of prejudice does not mean that prejudice must be "more probable than not" (*Frazier v. Superior Court* (1971) 5 Cal.3d 287, 294-295 [95 Cal.Rptr. 798, 486 P.2d 694]).

■ In assaying the record against this standard, this court must make an independent evaluation of the evidence as in a de novo proceeding and arrive at an independent judgment. It is not an abuse of discretion review (*Maine v. Superior Court* (1968) 68 Cal.2d 375, 382 [66 Cal.Rptr. 724, 438 P.2d 372]; *Fain v. Superior Court* (1970) 2 Cal.3d 46, 51 [84 Cal. Rptr. 135, 465 P.2d 23]; *Corona v. Superior Court* (1972) 24 Cal.App.3d 872, 875 [101 Cal.Rptr. 411]). Preference is given to a determination of the question before trial and doubts should be resolved in favor of granting the motion. (*Fain v. Superior Court, supra,* 2 Cal.3d 46, 54.)

■ In this case the significant factors are:

First, the size of the county. Stanislaus County has been judicially recognized as not being of such size as to disregard or be indifferent to a barrage

of publicity detailing a serious crime. (*Fain* v. *Superior Court, supra,* 2 Cal.3d 46.) The size of the area and population of Kern County and Bakersfield, which are considerably larger than Stanislaus County and Modesto, has been held to be inadequate to sufficiently dissipate the impact of adverse publicity surrounding a criminal trial (*Lansdown* v. *Superior Court, supra,* 10 Cal.App.3d 604, 609). In *Corona* v. *Superior Court, supra,* 24 Cal.App.3d 872, at page 883, with respect to the population factor, the court wisely stated: "At this point community population becomes a factor. The potential of community bias mounts in direct ratio to the pervasiveness of publicity. Delay may counteract publicity in medium-size and larger cities, but in small communities, where a major crime becomes embedded in the public consciousness, the effectiveness of delay is diminished." (Fn. omitted.)

The second important consideration in this case is the gravity of the offense involved. This factor is particularly salient since it is a retrial after a conviction of first degree murder before a jury in this relatively small community. In addition to the wide publicity of that conviction and sentence, the 12 jurors who sat on that trial have since been free to disseminate further extrajudicial comment among the populace.

Thirdly, very significant in this context is the persistent and repeated reference in the various newspaper articles to petitioner's prior criminal record, including the 1953 murder of his stepfather and the 1958 brutal assault on a stranger and the reference to the 10 years he spent as a felon in a penitentiary.

■ It is true, as respondent alleges, that the newspaper reports were factual rather than inflammatory. But, "A reasonable likelihood of unfairness may exist even though the news coverage was neither inflammatory nor productive of overt hostility." (*People* v. *Corona, supra,* 24 Cal.App. 3d at p. 877.)

Respondent emphasizes the time that elapsed between the time of the 1953 murder and the 1958 assault and the current trial. No doubt, as we have indicated, if there had been no reference to petitioner's prior criminality in the current publicity or during the penalty phase of his first trial, those acts would be too obscure and remote to be weighed. However, since the time of petitioner's arrest the repeated republication of information relating to these prior events must have served to freshen, incite and rekindle community interest in and intensify and enhance an all-pervasive knowledge of this highly prejudicial information.

As far back as 1879 the Supreme Court of this state in *People* v. *Yoakum,* 53 Cal. 566, at page 571, stated: "The prisoner, whether guilty

or not, is unquestionably entitled by the law of the land to have a fair and impartial trial. Unless this result be attained, one of the most important purposes for which, Government is organized and Courts of Justice established will have definitively failed." (See *People* v. *Tidwell* (1970) 3 Cal.3d 62, 76 [89 Cal.Rptr. 44, 473 P.2d 748].)

Though made in somewhat of a different factual setting, the remarks of Mr. Justice Friedman in *Corona* v. *Superior Court, supra,* 24 Cal.App. 3d 872, at pages 877-879, are appropriate: "Indispensable to any morally acceptable system of criminal justice is a verdict based upon evidence and argument received in open court, not from outside sources. When community attention is focused upon the suspect of a spectacular crime, the news media's dissemination of incriminatory circumstances sharply threatens the integrity of the coming trial. The prosecution may never offer the 'evidence' served up by the media. It may be inaccurate. Its inculpatory impact may diminish as new facts develop. It may be inadmissible at the trial as a matter of law. It may be hearsay. Its potentiality for prejudice may outweigh its tendency to prove guilt. It may have come to light as the product of an unconstitutional search and seizure. If it is ultimately admitted at the trial, the possibility of prejudice still exists, for it had entered the minds of potential jurors without the accompaniment of cross-examination or rebuttal.

"The goal of a fair trial in the locality of the crime is practically unattainable when the jury panel has been bathed in streams of circumstantial incrimination flowing from the news media. Questioned on *voir dire* as to the effect of the media's evidentiary disclosures, one prospective juror may deny or admit awareness, another disclaim or admit prejudgment. One may falsely deny both knowledge and prejudice for the sake of a place on the jury. An honest juror may admit knowledge or tentative prejudgment and find himself excluded. Many will sincerely try to set aside their preconceptions and give assurance of impartiality, yet unconsciously bend to the influence of initial impressions gained from the news media." (Fns. omitted.)

■ An independent review of the factors we have referred to in the light of the legal principles applicable persuades us that the place of trial should be changed. When we resolve doubts in favor of petitioner, which we are bound to do, there is a reasonable likelihood that the fairness of petitioner's retrial will be affected if held in Stanislaus County.

## MOTION TO EXCLUDE WITNESSES

On July 24, 1969, prior to petitioner's first trial, pursuant to a prosecution motion for discovery, the court ordered the defendant to supply to

the prosecution: "3. The names and addresses of the witnesses the defendant intends to call to testify in support of his affirmative defense. 4. Any statements, written or oral, in the possession of the defendant or his attorney, given by said witnesses."

Shortly thereafter petitioner's then counsel, Dennis M. Bourquin, by telephone furnished some names and addresses of potential witnesses to the deputy district attorney, Mr. Terry Cole.

On January 17, 1972, petitioner's current counsel, Mr. Korn, filed a noticed motion to exclude "as witnesses against defendant at trial those persons disclosed to the prosecution by defendant's former counsel pursuant to the prosecution's motion for discovery granted herein on July 24, 1969."

The motion is based upon the position that the discovery order violated petitioner's right against self-incrimination and is therefore void under the trinity of cases decided by the Supreme Court in April 1970 (*Prudhomme* v. *Superior Court,* 2 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673]; *In re Marcario,* 2 Cal.3d 329 [85 Cal.Rptr. 135, 466 P.2d 679]; *Bradshaw* v. *Superior Court,* 2 Cal.3d 332 [85 Cal.Rptr. 136, 466 P.2d 680]) and language in this court's opinion on the former appeal (*People* v. *Griffin, supra,* 18 Cal.App.3d 864, 870-871). By analogy to those cases which hold inadmissible the testimony of a witness obtained or induced in violation of constitutional rights, such as illegal search or interrogation, petitioner argues that the use of the witnesses furnished pursuant to the invalid discovery order must be suppressed. (*People* v. *Quicke* (1969) 71 Cal.2d 502, 521-522 [78 Cal.Rptr. 683, 455 P.2d 787]; *People* v. *Mickelson* (1963) 59 Cal.2d 448, 449-450 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Schaumloffel* (1959) 53 Cal.2d 96, 102-103 [346 P.2d 393].)

After a full hearing pursuant to the written motion, at which Mr. Bourquin and Mr. Cole testified, the trial court denied the motion on the ground that the names of the witnesses were not supplied pursuant to the compulsion of the discovery order. The judge's statement was: "I am going to note further though gentlemen, my review of the evidence presented, the discovery order was not complied with by the defendant's former counsel. My interpretation of his testimony is that any disclosure of any possible witnesses by him to the District Attorney's Office was not made pursuant to under the compulsion of the discovery order. Accordingly the motion to bar the use of witnesses allegedly disclosed by [*sic*] the prosecution, they will be denied."

Petitioner's counsel moved to reopen for the purpose of offering into

evidence a letter from Mr. Bourquin to the petitioner dated August 5, 1969, which in part states: "I have complied with the Court order and this date have furnished to the District Attorney the names and addresses of prospective witnesses. As you well know, many possible witnesses for the defense have no known address. However, all have been contacted by this office and none would be in a position to furnish anything damaging to your case upon interview. Conversely the District Attorney has furnished us with the names and addresses of all prospective witnesses."

The court denied the motion to reopen and in doing so stated:

"THE COURT: Well, I really don't think that I have got authority to reopen on that point. Even if I did, then certainly the prosecution would have the right to have Mr. Bourquin here to examine him with respect to it. You are offering it and there is no foundation for it, really.

". . . . . . . . . . . . . . . .

"THE COURT: Well, I just feel that I can't open it, Mr. Korn, and reopen that question. I think it's been determined adversely to your client. I will refuse your offer. If you want, for the record, to have it marked for Identification—"

The court clearly had the authority to reopen the hearing and it did not lack jurisdiction to do so. Insofar as its ruling was predicated upon lack of jurisdiction to reopen, the ruling was error. (*Robinson* v. *Superior Court* (1950) 35 Cal.2d 379, 383 [218 P.2d 10]; *Temple* v. *Superior Court* (1886) 70 Cal. 211, 212 [11 P. 699]; *Saidi-Tabatabai* v. *Superior Court* (1967) 253 Cal.App.2d 257, 261-262 [61 Cal.Rptr. 510].) The information contained in the letter would not only have furnished cogent proof that the witness list was furnished pursuant to the order, but would have also been relevant on the ultimate issue as to whether the disclosure of the witnesses tended to incriminate petitioner or lighten the prosecution's burden of proving its case in chief (*Prudhomme* v. *Superior Court, supra*, 2 Cal.3d 320, 326; *People* v. *Hall* (1970) 7 Cal.App.3d 562, 566 [86 Cal.Rptr. 504]). The phrase in that letter, "However, all have been contacted by this office and none would be in a position to furnish anything damaging to your case upon interview" would be highly relevant to the latter issues.

It is indeed difficult to locate the evidence upon which the court based its statement that the names and addresses of the witnesses were not furnished pursuant to the order. It seems abundantly clear to us that the purport of Mr. Bourquin's testimony was that he complied with that part of the order requiring the furnishing of witnesses but did not comply with

that part requiring the furnishing of witnesses' statements. The Attorney General has so conceded in his brief.

"Later in the proceedings, Dennis Bourguin, who has represented petitioner in his first trial, was called as a witness . . . . In response to a question asked of him as to whether or not he complied with the discovery order that was made by the superior court, the witness answered 'yes and no' . . . . In explaining this answer Mr. Bourguin stated that he did disclose the possible witnesses, but this was to the name and address only and under no circumstances did he tell the prosecution what the witnesses would say or in what context they would testify . . . . He also asserted that he was aware of the discovery order and that he had discussed it with his partners but that he did not comply with part of the order. . . .

". . . . . . . . . . . . . . . . .

"Moreover, the fact that the letter assertedly reflected that petitioner's first counsel had complied with the court order would not contradict anything that the witness had testified to at the hearing. As previously noted counsel testified that he had complied with part of but not all of the court order. Under these facts, it is evidence that the refusal of the trial court to reopen would not constitute an abuse of discretion."

In our former opinion (*People* v. *Griffin, supra,* 18 Cal.App.3d 864, 870-871) we referred to the discovery order as being void under the decision in *Prudhomme* v. *Superior Court, supra,* 2 Cal.3d 320, and *Bradshaw* v. *Superior Court, supra,* 2 Cal.3d 332. The court concluded in the *Prudhomme* case that a prosecution discovery order of similar content ". . . was in excess of the court's jurisdiction, and therefore void, in that it does not clearly appear from the face of the order or from the record below that the information demanded from petitioner cannot possibly have a tendency to incriminate her" (at p. 322). The order is within the ambit of this proscription.

But *Prudhomme* does not bar all prosecutorial discovery. It is expressly authorized under carefully circumscribed conditions. Those conditions are outlined at pages 326-327 of the opinion: "Thus, if we analyze *Jones* [*Jones* v. *Superior Court,* 58 Cal.2d 56 (22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R.2d 1213)] in the light of the policy considerations discussed in *Schader* [*People* v. *Schader,* 71 Cal.2d 761 (80 Cal.Rptr. 1, 457 P.2d 841)], it is apparent that the principal element in determining whether a particular demand for discovery should be allowed is not simply whether the information sought pertains to an 'affirmative defense,' or whether defendant intends to introduce or rely upon the evidence at trial, but whether disclosure thereof conceivably might lighten the prosecution's

burden of proving its case in chief. Although the prosecution should not be completely barred from pretrial discovery, defendant must be given the same right as an ordinary witness to show that disclosure of particular information could incriminate him.

"An ordinary witness need not actually prove the existence of an incriminatory hazard as that would surrender the very protection which the privilege against self-incrimination was designed to guarantee. Instead, the privilege forbids compelled disclosures which could serve as a 'link in the chain' of evidence tending to establish guilt of a criminal offense; in ruling upon a claim of privilege, the trial court must find that it clearly appears from a consideration of all the circumstances in the case that an answer to the challenged question cannot possibly have a tendency to incriminate the witness. [Citations.]

". . . . . . . . . . . . . . .

"We do not intend to suggest that the prosecution should be barred from *any* discovery in this, or any other, case. A reasonable demand for factual information which, as in *Jones,* pertains to a particular defense or defenses, and seeks only that information which defendant intends to introduce at trial, may present no substantial hazards of self-incrimination and therefore justify the trial judge in determining that under the facts and circumstances in the case before him it clearly appears that disclosure cannot possibly tend to incriminate defendant. However, unless those criteria are met, discovery should be refused." (2 Cal.3d at pp. 326-327; fns. omitted.) (See *People* v. *Hall, supra,* 7 Cal.App.3d 562, 566.)

Thus the respondent would have been entitled to the names and addresses of witnesses who meet the criteria of *Prudhomme,* assuming any do, if their identity had been ascertained upon proper notice and after a hearing at which the defendant was given the right to show that the disclosure of the information could incriminate him.

We are confronted, however, with the unique situation of the witnesses' names and addresses having been furnished pursuant to a void order prior to the first trial and of determining the petitioner's right to have the use of those witnesses by the prosecution suppressed in petitioner's up-coming second trial. We perceive no reason at this juncture and under these circumstances why it would not be entirely appropriate for the trial court to conduct the same type of hearing, using the same criteria contemplated by *Prudhomme,* with respect to the witnesses whose names have already been furnished.

Witnesses whose names the prosecution has come by independent of the

information furnished by the petitioner may be used in any event. (*Lockridge* v. *Superior Court* (1970) 3 Cal.3d 166, 170 [89 Cal.Rptr. 731, 474 P.2d 683].) Any witnesses actually called as witnesses by the petitioner during his first trial may also be used.

 It is apparent from the record before us that the trial court did not make an effort to arrive at such a determination. The evidence and the record before us are inadequate, too confusing, and too rife with conflicts to precisely and accurately make the determinations contemplated by a *Prudhomme* hearing. We have concluded, therefore, that in the interests of justice to all concerned the cause should be remanded for a new hearing in conformity with the above referred to principles and that the trial court should make the following factual determinations and arrive at the appropriate conclusions based thereon: (1) Determine the number and names of witnesses furnished by petitioner to the prosecution. (2) Of those furnished, the names of those who are known to or were discovered by the prosecution independent of information received from the petitioner. (3) Of those furnished, the names of those who were called and testified for the defense at the first trial. (4) As to the names of witnesses furnished, excluding the ones falling within categories (2) and (3) above, conduct a hearing in accordance with the criteria of *Prudhomme* and this opinion and determine those who meet the criteria of discoverability and those who do not. As to the latter category, the trial court should issue an order suppressing their use by the prosecutor on the retrial of this cause.

### MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS

Petitioner seeks to suppress evidence seized pursuant to search warrants issued on May 28, 1969, and June 2, 1969. Each was issued on the affidavit of Detective Robert Malone, an officer with 13 years' experience with the Santa Clara County Sheriff's Department. We will treat petitioner's contentions with respect to each of the search warrants in order.

### *May 28, 1969, Search Warrant*

 The petitioner is entitled to a hearing de novo in the superior court with respect to the adequacy of the affidavit to support a search warrant (Pen. Code, § 1538.5, subd. (i); *People* v. *Harrington* (1970) 2 Cal.3d 991, 995-996 [88 Cal.Rptr. 161, 471 P.2d 961]).

*Skelton* v. *Superior Court* (1969) 1 Cal.3d 144 [81 Cal.Rptr. 613, 460 P.2d 485], aptly summarizes many of the principles germane to the analysis of the sufficiency of an affidavit in support of a search warrant.

"The basic principles governing searches made pursuant to a warrant are clear and need no extended discussion here. The starting point for any analysis must be the words of the Fourth Amendment which provides, in relevant part, that '. . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.' The fundamental rights of the Fourth Amendment are guaranteed against invasion by the states by the Fourteenth Amendment [citation] and the standard for determining the existence *vel non* of probable cause is the same under the Fourth and Fourteenth Amendments. [Citation.]

"As the court stated in *Aguilar,* 'An evaluation of the constitutionality of a search warrant should begin with the rule that "the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . . who may happen to make arrests." ' Thus when a search is based on a warrant (and therefore on a magistrate's rather than a police officer's determination of probable cause) the reviewing courts 'will accept evidence of a less "judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant." . . . [citation] and will sustain the judicial determination so long as "there was substantial basis for [the magistrate] to conclude . . ." ' that the contraband was probably present. [Citation.] In order for a search warrant to satisfy the constitutional requirement of probable cause, the affidavits upon which it is based must contain competent evidence 'sufficient to support the finding of the magistrate.' [Citation.] In determining the sufficiency of an affidavit for the issuance of a search warrant the test of probable cause is approximately the same as that applicable to an arrest without a warrant, a commitment by a magistrate or an indictment by a grand jury [citations], namely, whether the facts contained in the affidavit are such as would lead a man of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion of the guilt of the accused. [Citation.] While it is clear that probable cause does not require as strong evidence as is needed to convict [citation], the exact quantum of evidence which will constitute probable cause must be judged in light of the facts and circumstances of each case. The rules of appellate review recognize the impracticality of establishing a precise calculus by which the existence of probable cause is to be determined: the warrant can be upset only if the affidavit fails as a matter of law to set forth sufficient competent evidence supportive of the magistrate's finding of probable cause, since it is the function of the trier of fact, not the reviewing court, to appraise and weigh evidence when presented by affidavit as well as when presented by oral testimony. [Citations.]" (At pp. 149-150.)

The basic test is enumerated in *People* v. *Hamilton* (1969) 71 Cal.2d 176, at pages 179-180 [77 Cal.Rptr. 785, 454 P.2d 681]: "In *Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], the United States Supreme Court stated: 'Although an affidavit may be based upon hearsay information and need not reflect the direct personal observations of the affiant, [citation], the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed [citation], was "credible" or his information "reliable." ' (Fn. omitted.) (378 U.S. at p. 114 [12 L.Ed.2d at p. 728].) The high court has since referred to this formulation as '*Aguilar's* two-pronged test.' [Citation.]

"Following *Aguilar*, California courts have held that for an affidavit based on an informant's hearsay statement to be legally sufficient to support the issuance of a search warrant, two requirements must be met: (1) the affidavit must allege the informant's statement in language that is factual rather than conclusionary and must establish that the informant spoke with personal knowledge of the matters contained in such statement; and (2) the affidavit must contain some underlying factual information from which the magistrate issuing the warrant can reasonably conclude that the informant was credible or his information reliable. [Citation.]" (See *Price* v. *Superior Court* (1970) 1 Cal.3d 836 at p. 840 [83 Cal.Rptr. 369, 463 P.2d 721].)

A recent expression of our Supreme Court emphasizes that the trial court should not invalidate a warrant by interpreting the affidavit in a hypertechnical rather than a common sense manner. In *People* v. *Superior Court (Johnson)* (1972) 6 Cal.3d 704, at page 711 [100 Cal.Rptr. 319, 493 P.2d 183], the court quoted with approval from *United States* v. *Ventresca,* 380 U.S. 102 [13 L.Ed.2d 684, 85 S.Ct. 741], as follows: " 'If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants . . . must be tested and interpreted by magistrates *and courts* in a commonsense and realistic fashion. They are normally drafted by non-lawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

" 'This is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's

belief that probable cause exists without detailing any of the "underlying circumstances" upon which that belief is based. [Citation.] Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, *the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner.* Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.' (Italics added.) (See also *United States* v. *Harris,* 403 U.S. 573 [29 L.Ed.2d 723, 91 S.Ct. 2075].)" (See *Halpin* v. *Superior Court* (1972) 6 Cal.3d 885, 894-895 [101 Cal.Rptr. 375, 495 P.2d 1295].)

The affidavit and search warrant describe the property to be seized as:

"1) .38 cal. gun and ammunition therefor;

2) between $400 and $500 U.S. currency;

3) road dust and other physical evidence on said automobile, including plant debris;

4) blood spots, powder burns, hair samples."

The officer's return, which was filed on June 5, 1969, reported the following items as having been seized:

"Items taken from apartment:

1) Two pr. trousers;

2) One pr. boots;

3) One .38 cal. cleaning rod;

4) One white rag with dark substance;

Items taken from vehicle:

1) Road dust from trunk lid area;

2) Vacuum debris from inside vehicle."

In summary, the affidavit in support of the search warrant recites: Zamlich, the victim, a resident of Santa Clara County, was found in a remote rural area just across the Stanislaus County line; at 12:35 a.m. on the morning of his death, the victim was in the company of petitioner; such

information was within the personal knowledge of the officer after examination of records at a bowling alley where the two were together; the victim and petitioner were together while confined to state prison; the victim died at approximately 2:30 a.m.; the driving time from the bowling alley where the victim was together with petitioner to the area where the body was found is approximately two hours; petitioner had a past history of criminal violence and murder; petitioner had advised the officer that the victim had approximately $1,000 in his possession on the morning of his death; when the victim's body was discovered he had no money in his possession; the officer had been informed from the records of petitioner's employer that petitioner had reported late for work on the morning of the victim's death; the roads in the vicinity where the victim's body was discovered were unpaved and dusty; petitioner had very recently had his automobile washed; and that the officer had the belief that petitioner was responsible for the murder of the victim.

▇ Measuring these facts against the legal standards required to support a warrant, the affidavit is clearly sufficient in this instance. A substantial part of the statements are based on personal knowledge, and, where based on information from third party sources, they clearly meet the test of *Aguilar* (*Aguilar* v. *Texas* (1964) 378 U.S. 108, 114 [12 L.Ed. 2d 723, 728, 84 S.Ct. 1509, 1514]). The third party information is stated in factual rather than conclusionary language and it appears the third party sources had personal knowledge of what was related. There is no issue as to the credibility of those sources.

Considered as a whole and giving the affidavit the practical construction to which it is entitled, sufficient facts are stated to lead a man of ordinary caution and prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused.

▇ The court ultimately refused to suppress the items listed on the return as "Two pr. trousers," "one pr. boots," "one white rag with dark substance" based upon Officer Malone's testimony at the hearing that the reason he picked up these items was that he thought the dark stains on each of them were human blood. Petitioner argues that it was improper for the trial court to consider the oral testimony of the officer at the hearing for the purpose of making this determination.

We find no substance to this argument. The issue did not go to the question of whether or not evidence received at the 1538.5 hearing can be used to augment a defective affidavit (*United States* v. *Roth* (7th Cir. 1967) 391 F.2d 507, 509) as petitioner contends, but rather to the sufficiency of the description of the items seized. Such procedure is expressly

authorized by Penal Code section 1538.5, subdivision (a)(2)(ii), (iv), (v) and 1538.5, subdivision (c).

Petitioner next attacks the warrant on the ground the officer made false statements in the affidavit. At the 1538.5 hearing there was uncertain and conflicting testimony from Officer Malone concerning whether on May 28, 1969, at the time of signing the affidavit, he believed Griffin to be responsible for the murder of Robert Zamlich. In addition, there was some conflict as to whether Malone had conversed directly with Griffin and had been informed by Griffin that Zamlich cashed a check for $400 to $500 the day before and had such a sum of money on his person the day before his body was discovered. Finally, there was also some ambiguity as to whether Griffin had stated to the officer that Zamlich had bragged on the evening before his death that he had in the vicinity of $1,000 on his person.

■■■■ Assuming that the affidavit can be impeached at a 1538.5 hearing,[1] the testimony at the hearing, which was some three years following the execution of the affidavit in question, was sufficient to support a finding by the trial judge that the officer was told these things by Griffin or, if not by Griffin directly, that he was present when Griffin told other officers. As the trial judge denied the motion to suppress we must presume in support of the order that he so found and that the affidavit was not effectively impeached. At any rate, whether Griffin told him directly or he learned the information from reliable third parties was not of decisive importance in validating the issuance of the warrant.

### June 2, 1969, Search Warrant

■■■■ Petitioner challenges this search warrant on the ground of insufficiency of the affidavit and on the further ground that the items seized pursuant to the warrant are not described in the affidavit or warrant with sufficient particularity.

The affidavit and the warrant were directed toward the following described personal property:

"1) Evidences of indebtedness by said GRIFFIN to other persons, including but not limited to such items as bills, contracts, checkstubs, checks, bankbooks, conditional sales contract on the above automobile, showing debts or payments of same by said GRIFFIN to other persons;

---

[1]This question is now before the Supreme Court in the case of *Theodor* v. *Superior Court,* originally reported at (Cal.App.) 98 Cal.Rptr. 486 (hearing granted Feb. 3, 1972). See also *Lockridge* v. *Superior Court* (1969) 275 Cal.App.2d 612, 621-625 [80 Cal.Rptr. 223]; and *Dunn* v. *Municipal Court* (1963) 220 Cal.App.2d 858, 866-867 [34 Cal.Rptr. 251].

2) Any papers relating to the sale of four new Dunlop tires on May 27, 1969, to said GRIFFIN by GERARD TIRE SERVICE in San Jose;

3) United States currency;

4) Telephone bills showing calls between said GRIFFIN and other persons and the number in the above residence of said GRIFFIN and other persons;

5) Any papers showing names and addresses of associates of said GRIFFIN."

Pursuant thereto the officers seized:

"1) Bank statements

2) Telephone billings

3) Two traffic citations

4) Vehicle purchase contract

5) Small spiral notebook

6) Numerous pieces of paper with names, addresses and phone numbers

7) Coupon payment book on vehicle

8) Past due notice from State Farm

9) Check book — 101 thru 125

10) Miracle Mile Car Wash stub

11) Great Book Label R82641046

12) S.F. Examiner paper—5/27/69

13) S.J. News paper—5/27/69"

Of these items the judge, as a result of the 1538.5 hearing, suppressed item 5, "Small spiral notebook," item 11, "Great Book Label R82641046," item 12, "S.F. Examiner paper—5/27/69," and item 13, "S.J. News paper—5/27/69."

The affidavit itself repeated verbatim the factual information contained in the affidavit for the issuance of the May 28 warrant which we have summarized hereinabove, and in addition sets forth the information contained in Appendix 1 hereto.

We agree that the affidavit is insufficient to support issuance of the

warrant as to items 1, 4 and 5 listed in it. In addition, with respect to that part of item 1 which reads "Evidences of indebtedness," and items 4 and 5 set forth in the affidavit, we are of the opinion that the description is so broad as to be violative of the constitutional and statutory provisions prohibiting a general exploratory warrant.

It is apparent that the statements of Officer Malone in the affidavit (see Appendix 1) regarding the "extremely poor financial condition" of petitioner and that he "owed debts to numerous individuals" as well as the statements regarding telephone records and addresses of associates are patently conclusionary and not factual and that these statements satisfy neither prong of the *Aguilar* test which we have heretofore referred to in this opinion. It cannot be ascertained whether the officer spoke with personal knowledge and, if not, from whom he procured the information, and if from an informant, whether the informant spoke with personal knowledge. Obviously there is nothing set forth other than conclusions upon which the magistrate could reasonably conclude that the information was credible or his information reliable.

It is true that: "In some instances, the identity of, or past experience with, the informer may provide evidence of the reliability of the information; in others, it may be supplied by similar information from other sources or by the personal observations of the police. [Citation.] Even though information from an informer is expressed in conclusionary language, and there is no showing why the informer is believed to be reliable on the basis of past experience, a magistrate may properly issue a warrant on the basis of such information if the supporting affidavit also recites facts indicating that reliance on the information is reasonable. [Citations.]" (*People* v. *Superior Court* (*Johnson*), *supra,* 6 Cal.3d 704, at p. 712.) Here, however, there are no facts whatsoever recited which will provide evidence of the reliability of the information imparted.

As to the description contained in item 1 of the affidavit, "Evidences of indebtedness," and the descriptions in items 4 and 5 of the affidavit, we believe they are so broad as to be violative of well settled principles under the Fourth Amendment of the United States Constitution, article I, section 19, of the California Constitution, and section 1525 of the Penal Code.[2]

---

[2]Article I, section 19, of the California Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable seizures and searches, shall not be violated; and no warrant shall issue, but on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized."

Penal Code section 1525 provides: "A search warrant cannot be issued but upon probable cause, supported by affidavit, naming or describing the person, and particularly describing the property and the place to be searched."

These basic constitutional and statutory provisions and the judicial interpretation of them find their philosophical basis in the hated colonial writ of assistance and the general warrant permitting an unlimited and generalized search. (*Stanford* v. *Texas* (1965) 379 U.S. 476 [13 L.Ed.2d 431, 85 S.Ct. 506]; *Aday* v. *Superior Court* (1956) 55 Cal.2d 789, 796 [13 Cal.Rptr. 415, 362 P.2d 47]; *People* v. *Berger* (1955) 44 Cal.2d 459, 461 [282 P.2d 509].)

 The statute mandates that the property must be described with reasonable particularity. The test which has been articulated by the cases to determine when this mandate is satisfied is whether the warrant places a meaningful restriction on the objects to be seized. (*Aday* v. *Superior Court, supra,* 55 Cal.2d 789, 796; *People* v. *Tenney* (1972) 25 Cal.App.3d 16, 22-23 [101 Cal.Rptr. 419]; *People* v. *Alvarado* (1967) 255 Cal. App.2d 285, 291 [62 Cal.Rptr. 891].)

The general purpose is to prevent the seizure of one thing under a warrant describing another. (*Stanford* v. *Texas, supra,* 379 U.S. 476, 485-486 [13 L.Ed.2d 431, 437-438, 85 S.Ct. 506, 512].) In *Stanford,* the warrant described the property to be seized as: " 'books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas, and the operations of the Communist Party in Texas.' " The court invalidated the warrant and stated: "The indiscriminate sweep of that language is constitutionally intolerable. To hold otherwise would be false to the terms of the Fourth Amendment, false to its meaning, and false to its history."

In *People* v. *Mayen* (1922) 188 Cal. 237, 240, 242 [205 P. 435, 24 A.L.R. 1383], the court held invalid a warrant directing the seizure of " 'certain personal property used as a means of committing a public offense, to-wit, attempted grand larceny.' " The affidavit described the property as "personal goods and property, to wit, certain paraphernalia."

In *Aday* v. *Superior Court, supra,* 55 Cal.2d 789, the Supreme Court invalidated a warrant based on an affidavit which described the property to be seized as:

"1. 'Checks, check stubs, cancelled checks, check books and bank statements.' 2. 'Sales records and purchase records.' 3. 'Customers' correspondence and customers' orders.' 4. 'Invoices.' 5. 'Bills.' 6. 'Vouchers.' 7. 'Statements.' 8. 'General ledgers, cash receivable ledgers, cash disbursement ledgers, subsidiary accounts receivable ledgers and subsidiary accounts payable ledgers.' 9. 'Mailing lists.' . . . 11. 'Articles of Incorporation.' 12. 'Minutes of the board of directors.' 13. 'Stockholder

records.' 14. 'Corporate records' of the corporate petitioners. 15. 'Corporate records, papers, correspondence, sales receipts and bills of lading having to do with' the corporate petitioners. . . . 17. 'Model releases, writings, stories, cartoon and advertisements.' 18. 'Contracts.' 19. 'Any and all other records and paraphernalia connected with' the business of the corporate petitioners." (At p. 793.)

In *Stern* v. *Superior Court* (1946) 76 Cal.App.2d 772, 783-784 [174 P.2d 34], the court invalidated the seizure of $50,000 in cash from a safe deposit box, stating that it was not within the description in the warrant of "other evidence."

We conclude that items 1, 2, 3, 4, 6, 7, 8, 9, and 10 listed on the return to the search warrant of June 2 should be suppressed and as to those items petitioner's motion under Penal Code section 1538.5 should have been granted.

ADMISSIBILITY OF STATEMENTS TAKEN
MAY 28, 1969 AND JUNE 1, 1969

Preliminarily, respondent urges that there is no recognized "common law" pretrial motion to suppress a statement allegedly obtained in violation of *Miranda* v. *Arizona, supra,* 384 U.S. 436. There is no merit to this contention. (Cf. *People* v. *Clark* (1969) 2 Cal.App.3d 510, 513 [82 Cal.Rptr. 682]; *People* v. *Superior Court* (1969) 275 Cal.App.2d 49, 52 [79 Cal. Rptr. 704].)

Upon the former appeal, this court held that petitioner waived his *Miranda* rights before he gave the incriminatory statements. We do not, however, consider that holding to be the law of the case as the decision was based upon the testimony of the officer alone without the full transcript of the actual statements. We now have the full transcript which presents additional considerations not then before the court and we are therefore free to reconsider our conclusions. (*People* v. *Terry* (1964) 61 Cal.2d 137, 151, fn. 9 [37 Cal.Rptr. 605, 390 P.2d 381]; *Subsequent Injuries Fund* v. *Ind. Acc. Com.* (1960) 53 Cal.2d 392, 395 [1 Cal.Rptr. 833, 348 P.2d 193]; *Steelduct Co.* v. *Henger-Seltzer Co.* (1945) 26 Cal. 2d 634, 644 [160 P.2d 804].)

Petitioner's principal contention is that the statement of May 28 was taken in violation of his *Miranda* rights. After a review of the statements and transcript of the lengthy hearing held in the superior court, we reaffirm our holding on the former appeal. We then stated: "We have carefully reviewed appellant's contention that he did not waive his *Miranda* rights before talking with Officer Manley on the night of the killing, and

we find no merit in his contention. He does not question that a proper *Miranda* warning was given or that he understood his rights. He relies on the fact that he did not expressly waive those rights. A waiver does not require a written or oral statement to substantiate it. [Citation.] He consciously chose to continue to speak and to answer questions after being advised of those rights and indicating that he understood them, and he did not request that his questioning cease or to talk to a lawyer at any stage of the interrogation. Before the statements to the officer were admitted, the judge properly held a lengthy hearing in chambers. At that hearing he determined that appellant understood and had waived his *Miranda* rights. The record clearly supports the learned judge's conclusion." (*People* v. *Griffin, supra,* 18 Cal.App.3d at p. 871.)

 It is first to be noted that there was a full hearing on these questions in the trial court and the court expressly found against petitioner's position. That finding should not be disturbed unless it is palpably erroneous. (*People* v. *Long* (1970) 6 Cal.App.3d 741, 747 [86 Cal.Rptr. 227]; *People* v. *Daniels* (1969) 1 Cal.App.3d 367, 374 [81 Cal.Rptr. 675].)

 There is no question that the *Miranda* warning was given. His counsel stipulated that petitioner understood the *Miranda* admonition. It was apparent that he did understand it and it is also obvious that he was fully aware that he was a suspect. Petitioner was no callow youth. It is observed that there is testimony that he is a person of normal intelligence. He had been through the mill, so to speak, having had two trials, one for murder and one for assault with a deadly weapon, and having spent 10 years in the penitentiary. It is evident that his remarks were responsive but guarded following the advisement, and it is also significant that he was partially responsible for initiating the interrogation by calling the police, advising them of his plan to leave for Livingston and requesting that they talk to him if they desired to do so before he left town on May 28. It also appears from a review of the entire transcript that during the course of the interview he was fencing with the police. Each thrust was met by a parry and each parry by a riposté. His effort was to determine how much the police knew. It is apparent that he was as much interested in obtaining information from the police as the police were in finding out additional information from him.

 A waiver of *Miranda* rights need not be express but may be implied from conduct. Here, in addition to other factors, there is the significant fact that petitioner himself sought the interview and continued to ask and answer questions after being fully advised of his *Miranda* rights (*People* v. *Johnson* (1969) 70 Cal.2d 541, 557-558 [75 Cal.Rptr. 401,

450 P.2d 865, 43 A.L.R.3d 366]; *People* v. *Samaniego* (1968) 263 Cal. App.2d 804, 810 [69 Cal.Rptr. 904]; *People* v. *Shaw* (1968) 267 Cal. App.2d 679, 682 [73 Cal.Rptr. 499]).

The central question now raised that was not present on the former appeal is whether petitioner, after he was subjected to a polygraph test, invoked his Fifth Amendment privilege by his several references to an attorney.

In *People* v. *Burton* (1971) 6 Cal.3d 375, 381-382 [99 Cal.Rptr. 1, 491 P.2d 793], our Supreme Court recently summarized: " '. . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.' [Citation.] In *People* v. *Randall, supra,* 1 Cal. 3d 948, 954 [83 Cal.Rptr. 658, 464 P.2d 114], we observed that 'This obligation on the police to entirely terminate custodial interrogation upon invocation of the Fifth Amendment privilege is one of the primary "protective devices" fashioned by *Miranda.* [Fn. omitted.]'

"In cases where the suspect makes no express assertion, the crucial question is what behavior is necessary to constitute an invocation of the Fifth Amendment privilege. We have stated several times that no particular form of words or conduct is necessary to constitute such an invocation. 'A suspect may indicate such a wish in many ways.' [Citation.] 'To strictly limit the manner in which a suspect may assert the privilege, or to demand that it be invoked with unmistakable clarity (resolving any ambiguity against the defendant) would subvert *Miranda's* prophylactic intent.' [Citation.]

"Any words or conduct which 'reasonably appears inconsistent with a present willingness on the part of the suspect to discuss his case freely and completely with police *at that time* [fn. omitted]' [citation] must be held to amount to an invocation of the Fifth Amendment privilege."

The transcription of the recorded statement taken on May 28 is 136 pages in length, consisting of 80 pages before a polygraph test was administered and a 56-page transcript after the test. The first mention of an attorney is at page 25 of the second statement. This is 105 pages from the commencement of the transcript. At page 25 he said: "You're trying to uh, uh, see, just like you're trying to build a case for a prosecution on a murder beef and uh, I'm trying to uh, and I'm trying to save my hold cards for if I do have to go to court, and uh, perhaps I probably should talk to a lawyer first. But the thing is, uh, you men are very intelligent. You have to be to have this kind of job, but uh, uh, and I don't have any experience in these matters, that you do, but I'm not stupid either you know." Subse-

quently, at page 32, he said: "If I had the money, if I had the money to spend for an attorney fee, for one thing, I really, you know, uh, you can get convicted for something you didn't do."

And later, at page 38, petitioner remarked: "Because uh, I'm not trying to outsmart you in a manner of trying to beat a murder beef, but uh . . . I would like to avoid a big court hassle because uh, even if I conned my people out of the money, it uh, God, I think in a way I'd probably rather go to the gas chamber than have them pay the high powered lawyers who take it, you know, and uh, as strongly as the finger of suspicion is pointing at me, maybe somebody is even trying to put it on me, I don't know. You talking about people you talked to and things, but uh, . . ."

Taken in the context of petitioner's background, his age and experience, his intelligence, the spontaneity with which he fenced and parried with the police, we believe that the above statements by this person at that time, under those circumstances, were not an indication of a desire to invoke his Fifth Amendment privilege. They were nothing more than a casual reference in the course of his ploy to find out how much the police knew and his effort to talk them out of arresting him as a suspect.

As such, the case is distinguishable from a minor calling his parents (*People* v. *Burton, supra,* 6 Cal.3d 375), a direct request as "Call my parents for an attorney" (*People* v. *Ireland* (1969) 70 Cal.2d 522, 533 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]), actually making a telephone call to an attorney (*People* v. *Randall* (1970) 1 Cal.3d 948, 958 [83 Cal.Rptr. 658, 464 P.2d 114]), or a flat refusal when expressly requested to sign a waiver of constitutional rights (*People* v. *Fioritto* (1968) 68 Cal.2d 714, 718-719 [68 Cal.Rptr. 817, 441 P.2d 625]). ▮ Petitioner suggests that the statement of May 28 was induced by express or implied promises of leniency or advantage. He states at page 24 of his opening petition: "The suggestive questioning of petitioner, clearly implying that if he cooperated and confessed, a jury might be sympathetic, and statements made to him by the police that he was not regarded as a suspect, should invalidate the May 28 statements even under *pre-Miranda* standards." He cites *People* v. *Brommel* (1961) 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845].

We have reviewed the statement in detail and the transcript of the hearing on the motion and find nothing remotely suggesting such a conclusion. It does not appear the officers by implication suggested that petitioner would receive leniency should he cooperate with the police and confess. Rather, the police did continue to intimate that if he was innocent and would give the police an adequate account of his whereabouts after leaving

the victim on the morning of the murder he would be free to leave and would be dismissed as a suspect. This he could not do. There was no psychological coercion, trickery or cajolery. ·

 On June 1, 1969, while petitioner was in custody at the Stanislaus County Jail, Deputy Sheriff Manley recorded a 20-page question and answer statement from him which was the result of an interview at his request. The statement was innocuous. It was an effort by petitioner to divert the attention from himself as a suspect by suggesting others who could have been responsible for the homicide.

With respect to this statement, the record demonstrates conclusively that (1) petitioner at the time had retained Attorney Bourquin as his attorney, (2) Attorney Bourquin continued to represent him throughout the first trial, (3) the deputy sheriff knew that he was represented by an attorney, (4) petitioner solicited the deputy sheriff to come to the jail because he wanted to talk to him, (5) petitioner, knowing that he had the right to have his attorney present, expressly waived the presence of his attorney and said, in addition to making an express waiver, ". . . that's right I'm represented by an attorney who might blow his mind if he knew I was talking to you."

The trial judge denied the motion to suppress the statement on the announced ground that it was voluntarily given at petitioner's instigation. We agree.

 The emphasis throughout the cases in this field is upon two salient features: (1) Whether the individual has volunteered the information without any pressure from the police, psychological or otherwise, and (2) whether the individual or the police instigated and initiated the conversations which result in the statements being made.

In *People* v. *Carroll* (1970) 4 Cal.App.3d 52, 57 [84 Cal.Rptr. 60], this court held that an in-custody confession is admissible though the defendant first refused to talk on being advised of his *Miranda* rights but subsequently voluntarily changed his mind and gave the confession as the result of his own initiative and not in the context of custodial interrogation. In that case he had no attorney. (See also *People* v. *Johnson* (1971) 20 Cal.App.3d 168, 175 [97 Cal.Rptr. 332]; *People* v. *Daniels, supra,* 1 Cal. App.3d 367, 373.)

It is also clear that though a defendant may be represented by counsel and in custody, if he volunteers statements made to third persons and not in response to police interrogation they may be used without violating his Fifth Amendment rights. (*People* v. *Goedecke* (1967) 65 Cal.2d 850,

859-860 [56 Cal.Rptr. 624, 423 P.2d 777, 22 A.L.R.3d 1213]; *People* v. *Jones* (1971) 19 Cal.App.3d 437, 449 [96 Cal.Rptr. 795]; *People* v. *Terry* (1969) 70 Cal.2d 410, 421 [77 Cal.Rptr. 460, 454 P.2d 36].)

In *People* v. *Isby* (1968) 267 Cal.App.2d 484 [73 Cal.Rptr. 294], *People* v. *Valencia* (1968) 267 Cal.App.2d 620, 626-627 [73 Cal.Rptr. 303], and *Tidwell* v. *Superior Court* (1971) 17 Cal.App.3d 780, 789-790 [95 Cal.Rptr. 213], it was held that a defendant may not be subjected to an interrogation or request for consent to search instigated or initiated by law enforcement officers when he is in custody and represented by counsel even though he attempts to waive the same. (See *People* v. *Isby, supra,* at pp. 490-495.)

*People* v. *Garner* (1961) 57 Cal.2d 135 [18 Cal.Rptr. 40, 367 P.2d 680] is in point. That case expressly held: "The absence of a defendant's counsel at the time he freely and voluntarily makes a confession, without threats, force, duress, or promise of reward, does not of itself render the confession inadmissible and in violation of the due process clause of the federal Constitution. [Citations.]" (At p. 149.)

"As heretofore pointed out, defendant had sent word to the sheriff that he wanted to see him, and upon the sheriff's arrival voluntarily gave what he then insisted was a true account of the crimes. Clearly this confession was not the result of any grueling of defendant." (At p. 152.)

Justice Traynor in a concurring opinion in the *Garner* case stated:

"So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation. [Citations.]" (At p. 164; fn. omitted.)

"Recognition of a defendant's right to consult with counsel at the pretrial stages of the criminal action does not signify that counsel must be present during interrogation." (At p. 165.)

"The right to counsel does not imply, however, that a defendant lawfully in custody must be insulated from the police. If the police abuse their right to interrogate, the remedy is to exclude the involuntary confessions or admissions produced. [Citations.]" (At p. 166.)

*Garner* has not been qualified or overruled and we are bound by it. On principle, since a defendant may under proper circumstances waive his constitutional right to counsel before counsel is appointed, and he may waive other basic constitutional rights such as his right to a jury, his right to confront his accusers and cross-examine them and others (*People* v. *White* (1971) 18 Cal.App.3d 44, 48-51 [95 Cal.Rptr. 576]), no reason

appears why, under circumstances such as those existing in this case, a defendant may not waive his right to have his attorney present when he volunteers a statement which in no way was initiated or requested by the police or induced by police pressure, psychological or otherwise.

## ORDER FIXING BAIL

The trial court fixed bail at $150,000 corporate surety or $300,000 personal undertaking.

 Habeas corpus and not mandamus or prohibition is an appropriate remedy to review an order fixing bail. (Pen. Code, §§ 1490, 1277, 1291; *In re Newbern* (1961) 55 Cal.2d 500, 503 [11 Cal.Rptr. 547, 360 P.2d 43]; *People* v. *Norman* (1967) 252 Cal.App.2d 381, 394 [60 Cal.Rptr. 609].) We have discovered no reported cases where such an order has been reviewed on a petition for mandamus or prohibition.

 However, assuming we were to treat the petition as one for a writ of habeas corpus, we find no abuse of discretion by the trial court.

Penal Code section 1275 directs the trial court to take into consideration in fixing the amount of bail "the seriousness of the offense charged, the previous criminal record of the defendant, and the probability of his appearing at the trial or hearing of the case."

 It is settled that the matter of fixing bail is within the discretion of the trial court. (*In re Morehead* (1951) 107 Cal.App.2d 346, 349 [237 P.2d 335]; *People* v. *Norman, supra,* 252 Cal.App.2d 381, 398.)

 We cannot say that the trial court abused its discretion. It was aware of petitioner's past record of criminality. It was aware of his conviction upon the prior trial in this case and the two prior convictions, one for murder and one for assault with a deadly weapon, as a result of which he spent time both in the Youth Authority and 10 years in the penitentiary. It was aware of some statements made by petitioner during the course of his interrogation to the effect that he should leave this area entirely. There was ample fortification for the trial judge's decision to fix the bail in the amount that was fixed in order to assure petitioner's attendance upon the trial.

Let a peremptory writ of mandate issue:

1. Directing the Superior Court of Stanislaus County to grant the motion for change of venue, hold a hearing to determine a place where a fair and impartial trial can be had and transfer the cause to that place,

all in compliance with California Rules of Court numbered 840-844 (adopted March 4, 1972).

2. Directing the superior court to hold further hearings on petitioner's motion to exclude certain witnesses consistent with this opinion.

3. Directing the superior court to suppress as evidence and return to petitioner items 1, 2, 3, 4, 6, 7, 8, 9 and 10 listed on the return to the search warrant of June 2, 1969.

Except as hereinabove granted, the petition for writ of mandate is denied and the alternate writ discharged.

Stone, P. J., and Gargano, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied September 7, 1972.

---

## APPENDIX 1

Affiant has ascertained from THOMAS BRADEL and GERARD TIRE SERVICE in San Jose that on May 27, the day following the murder, said GRIFFIN purchased four new tires even though he did not need new tires, which tires affiant has observed on the above described automobile when executing a previous search warrant.

Affiant has ascertained that said GRIFFIN at the time of the murder was in extremely poor financial condition and owed debts to numerous individuals. Affiant believes said debts will constitute evidence relating to the motive or one of the motives for said murder.

Affiant believes records relating to said tires will constitute evidence of the commission of a felony in that they will show where some of the stolen money was spent by said GRIFFIN.

Affiant believes that the aforementioned telephone records and addresses of associates will likewise furnish evidence of the commission of a felony in that they will show other parties to whom said GRIFFIN owed money and with whom he was involved in dealings concerning narcotics.

Affiant believes said automobile will contain physical evidence relating to the commission of the homicide in that the trunk of said automobile, as searched pursuant to a previous warrant, is thickly covered with a peculiar dust apparently from roads leading to where the body was found.

That based upon the above facts, your affiant prays that a Search Warrant be issued with respect to the above location for the seizure of said property, and that the same be held under Calif. Penal Code Section 1536 and disposed of according to law.